## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

CHRISTOPHER DESANTIS,

       Plaintiff,

vs.                                                                                    No. CIV 08-1205 JB/KBM

JANET NAPOLITANO,
Secretary of Homeland Security,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Appeal of the Final Decision (Order) of the

Merit System Protection Board, filed January 20, 2010 (Doc. 36).  The Court held a hearing on April

29, 2010.   This case is an appeal from two decisions of the Merit Systems Protection Board

("MSPB").  The primary issue is whether the Court should uphold the action of the MSPB affirming

an Administrative Judge's decision to uphold an adverse employment action by Plaintiff Christopher

DeSantis' employer.  Because the Court finds no ground upon which to hold that the MSPB acted

arbitrarily or capriciously, or otherwise not in accordance with the law, the Court will affirm the

MSPB's upholding the grounds for DeSantis' dismissal.[1]

## FACTUAL BACKGROUND

       DeSantis is a former Criminal Investigator-Special Agent and employee of the United States

---

[1] DeSantis appeals MSPB decisions denying him relief on complaints based on both discrimination and non-discrimination grounds.  The Court affirms the MSPB's action only with respect to DeSantis' non-discrimination ground for relief in his appeal of the MSPB's affirmance of his dismissal.  With respect to DeSantis' claim of employment discrimination, DeSantis is entitled to review by trial *de novo*.  Furthermore, the Court will dismiss for lack of jurisdiction DeSantis' attempt to appeal to this Court the MSPB's rejection of his individual right of action, under the Whistleblower Protection Act of 1989, which challenged a threatened fourteen-day suspension.

Customs Service and its successor, the Department of Homeland Security.  See Defendant's Response to Plaintiff's Appeal of the Final Decision (Order) of the Merit Systems Protection Board at 4, filed February 11, 2010 (Doc. 38)("Response").  He has been a law enforcement officer since 1991.  At all times relevant to this appeal up until August 10, 2007, DeSantis was an agent with the United States Immigration and Customs Enforcement ("ICE") Agency and was stationed in Deming, New Mexico.  See Response at 4.

DeSantis' dismissal from his position as an ICE agent stemmed from a sequence of conduct dating from January 24, 2007 through August 10, 2007.  He was removed from service based on three Charges.  The first Charge was "Failure to Follow Policy, Procedure, Practice, Protocol or Rule," which was supported by two Specifications: (i) failure to have ICE take over a Border Patrol investigation when the body of a dead alien was discovered in January of 2007, and (ii) failure to have ICE take over a Border Patrol interdiction and investigate an apparent person-smuggling operation in which Border Patrol agents found several aliens in a locked box on a semi truck in March of 2007.  These failures were allegedly in violation of a policy whereby ICE would take over cases involving alien deaths, alien endangerment or injury, or cases involving juveniles.

The second Charge was "Lack of Candor," which stemmed from two acts revolving around the March 2007 incident.  First, according to Senior Border Patrol Agent James Sheffield, Sheffield told DeSantis several times by telephone that Border Patrol had found aliens locked inside the truck that the agents found in March 2007, yet DeSantis failed to convey that information to Adam Wilson, his superior, when reporting to Wilson regarding the call.  When Wilson asked DeSantis if any aliens were found inside the tractor trailer, DeSantis said "no."  The second incident was DeSantis making a signed, written statement wherein he wrote: "[I]n this case no one ever mentioned that any of the aliens were locked in or inside of anything or anyplace."  Again this

-2-

statement conflicted with what Sheffield allegedly told DeSantis.  DeSantis' superiors found Sheffield's version of events more credible and considered DeSantis' statements to the contrary lacking in candor.

The final Charge accused DeSantis of "Disruptive Behavior" stemming from four separate incidents.  The first three incidents involved DeSantis making insulting and inflammatory comments to Special Agent Xavier Diaz regarding Diaz and/or the Border Patrol, made in the presence of Diaz and other Border Patrol agents.  The fourth incident involved disturbing and somewhat threatening comments regarding the Virginia Tech shooting in 2007.  The AJ quoted the following description of the final incident as follows:

> On April 20, 2007, four days after the shooting incident at Virginia Tech University, [DeSantis] entered the Deming Office of Investigations and asked Senior Special Agent Jeff Mayfield if the codes to enter the building had been changed because of [him].  After a brief conversation with SSA Mayfield, [DeSantis] then made statements to the effect of "I can't figure out if they (ICE) are out to get me or if I am just paranoid," "You know I was watching the shooting on TV (reference to Virginia Tech) and the people they were interviewing were just saying how all the signs were there, yet no one did anything about it," "Do I have to come in the office and start shooting people before they (ICE) believe that I'm injured?  They just don't get it," "Six months ago I would have went on a shooting rampage if I had come in and the locks were changed," "I can't stand all the backstabbing and lies that go on around here," "I'm going to pack some things from my office, I'm not going to be stealing anything."

DeSantis v. Dep't of Homeland Security, No. DE-0752-07-0509-I-2, Initial Decision at 6-7 (M.S.P.B. June 10, 2008), found at Admin. Record 1309-1348.[2]

Based on these three Charges -- and the total of eight individual Specifications -- ICE's

---

[2] By agreement between DeSantis and the Defendant, the Defendant arranged to have the Merit Systems Protection Board's official record Bates stamped, and provided a stamped copy to both DeSantis and to the Court.  References to the record will be denoted "AR" and page numbers will refer to the Bates numbers in the lower right-hand corner of each pages, i.e., citations to the record will be of the form AR XXXX.

Disciplinary and Adverse Actions Panel on May 10, 2007, proposed to remove DeSantis from his position.  <u>See</u> AR 1312-1331.  On July 25, 2007, the deciding official, Roberto Medina, told DeSantis that he was considering disciplinary action for the above conduct and gave DeSantis an opportunity to respond.  <u>See</u> AR 1316.  On August 10, 2007, Medina sustained all Charges and Specifications and removed DeSantis from his position, effective August 15, 2007.  <u>See</u> <u>id.</u>

## PROCEDURAL BACKGROUND

DeSantis challenged a threatened fourteen-day suspension and his removal from service through the MSPB via two separate actions.  The first, filed September 10, 2007, challenged the August 15, 2007 removal from his position as an ICE agent.  <u>See</u> AR 1309.  The second was an individual right of action ("IRA") challenging the agency's threat to suspend him for fourteen days, although the suspension never occurred because Medina decided to dismiss DeSantis first.  <u>See</u> AR 464-469.  He asserted that the suspension was retaliation for whistle-blowing activity, in violation of the Whistleblower Protection Act of 1989 ("WPA").  <u>See</u> AR 464-469.  Both cases were assigned to the same AJ for Initial Decision.  On June 10, 2008, the AJ issued the first Initial Decision, in which he sustained all three Charges against DeSantis and upheld his dismissal.  On the first Charge, the AJ rejected Specification 1 because, although he found DeSantis was aware of the policy regarding ICE taking control of investigations involving alien death or endangerment in January of 2007, it was unclear whether DeSantis knew failure to comply with that policy could result in discipline.  The AJ upheld Specification 2, however, because DeSantis knew by March of 2007 that failure to comply with the policy could result in discipline.  <u>See</u> AR 1320-1332.  The AJ upheld the second Charge on both proffered Specifications and upheld the third Charge on three of the four Specifications.  <u>See</u> AR 1332-1336.  The AJ rejected DeSantis' remaining defenses and affirmed his dismissal.  <u>See</u> AR 1336-1344.  The AJ also denied DeSantis' claims that his suspension violated

the WPA, finding that DeSantis had not proven he made a protected disclosure which was a contributing factor to the dismissal.  See AR 464-474.  DeSantis appealed both Initial Decisions to the MSPB, which sustained both decisions by Final Orders.  See AR 2871-2871; id. 2950-2951.

DeSantis appeals the MSPB's Final Orders.  He seeks review of a "mixed case" MSPB appeal that includes claims that his removal from his position as an ICE agent was discriminatory and contends that his removal was otherwise wrongful.  DeSantis contests many of the facts as the AJ found them.  His bases for appeal are as follows: (i) the Defendant engaged in "outrageous" conduct by either withholding vital documentary evidence during discovery or having one of its witnesses lied during the first hearing, and that such conduct justifies setting aside his dismissal; (ii) there is new evidence regarding the discrimination claim that was not available to the AJ; (iii) there was no written description of what constituted an "endangerment" case, and so DeSantis should not be penalized for failing to take charge of one; (iv) the AJ incorrectly denied DeSantis' request to merge the two Specifications supporting Charge 2, and the first three Specifications supporting Charge 3; and (v) with respect to the whistleblower claim the MSPB dealt with in DeSantis' IRA, DeSantis alleges that the MSPB's decision was based on an erroneous interpretation of the law.  The Defendant argues: (i) DeSantis is misconstruing the evidence at the hearing, and thus his "outrageous conduct" claim lacks merit; (ii) there need not be a written definition of "endangerment" for DeSantis to be held responsible for violating the policy regarding alien-endangerment cases; (iii) the record fully supports the lack-of-candor Charge; (iv) DeSantis' argument about merger of Specifications is misplaced; and (v) DeSantis' new evidence regarding his disabilities is not new material evidence justifying reversal of the MSPB's decisions.  In this opinion, dealing only with DeSantis' non-discrimination-based claims of wrongful employment action, reviewed under the deferential standard set forth in 5 U.S.C. § 7703(c), the Court affirms the

-5-

decision of the MSPB and denies that portion of DeSantis' appeal.  With respect to DeSantis' appeal

of his separate IRA alleging discrimination under the WPA, however, the Court finds that it lacks

jurisdiction and dismisses the appeal without prejudice.

## THE MERIT SYSTEMS PROTECTION BOARD

"Federal employees, like employees of private concerns, must exhaust the applicable

administrative remedies before seeking judicial review." Dossa v. Wynne, 529 F.3d 911, 913 (10th

Cir. 2008)(citing Coffman v. Glickman, 328 F.3d 619, 624 (10th Cir. 2003)).  "A federal employee

may exhaust administrative remedies either by filing a complaint with the [Equal Employment

Opportunity] department of the employing agency or by proceeding to the MSPB." Dossa v.

Wynne, 529 F.3d at 913.  "If the employee chooses to appeal to the MSPB . . . the employee will

have a hearing at which he or she must raise his or her claims of discrimination and present evidence

in support of those claims in order to exhaust the administrative remedy." Coffman v. Glickman,

328 F.3d at 624.

## STANDARD OF REVIEW

In reviewing the MSPB's decisions, the standard of review depends on the nature of the

claim brought before the MSPB.  General claims of wrongful adverse employment action by a

federal employer are reviewed solely on the administrative record and can be set aside only where

the agency's "action, findings, or conclusions [are] found to be (1) arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by

law, rule, or regulation having been followed; or (3) unsupported by substantial evidence[.]"

5 U.S.C. § 7703(c).  Such appeals must be filed in the United States Court of Appeals for the Federal

Circuit.  See Coffman v. Glickman, 328 F.3d at 621 ("Review of a MSPB determination which does

not involve claims of unlawful discrimination is conducted by the United States Court of Appeals

for the Federal Circuit."); Williams v. Rice, 983 F.2d 177, 179-80 (10th Cir. 1993)("Normally, pursuant to 5 U.S.C. § 7703(b)(1), the Federal Circuit has exclusive jurisdiction over appeals from the MSPB[.]")(citing 5 U.S.C. § 7703(b)(2)).   Under this arbitrary-and-capricious standard of review, "[t]he reviewing court 'may not substitute its judgment for that of the MSPB.'"   Williams v. Rice, 983 F.2d at 180 (quoting Wilder v. Prokop, 846 F.2d 613, 619 (10th Cir. 1988)).   "Under the arbitrary and capricious standard the MSPB's decision needs only to have a rational basis in law." Wilder v. Prokop, 846 F.2d 613, 619 (10th Cir. 1988).

Where the plaintiff complains of an adverse employment action that includes an allegation of unlawful discrimination, however, the appeal may be brought in the federal district court having proper venue and jurisdiction over the parties.   See Coffman v. Glickman, 328 F.3d at 621-22 ("[W]hen an appeal to the MSPB involves claims of unlawful discrimination related to or stemming from the employment action, it is considered a 'mixed' appeal.   Review of MSPB determinations in "mixed" cases lies solely in a district court."); Williams v. Rice, 983 F.2d at 179-80 ("[T]he Federal Circuit has exclusive jurisdiction over appeals from the MSPB, except where, as here, the appellant's claim includes an allegation of discrimination."); Wall v. United States, 871 F.2d 1540, 1542 (10th Cir. 1989)("[C]ases of alleged discrimination 'subject to the provisions of section 7702' shall be filed under the applicable statute in a United States District Court."); 5 U.S.C. § 7703(b)(1), (2) (placing exclusive jurisdiction of MSPB appeals in the Federal Circuit, except "[c]ases of discrimination subject to the provisions of section 7702 of this title").

> Discrimination cases "subject to the provisions of section 7702" include cases where an employee or an applicant for employment (1) has been affected by an action of an agency which may be appealed to the Board and (2) alleges that the basis for the agency's action was discrimination prohibited by, *inter alia*, the Rehabilitation Act of 1973 and the Age Discrimination in Employment Act of 1967.

Wall v. United States, 871 F.2d at 1542.   Even when the plaintiff alleges multiple bases for his

MSPB action, only one of which is a discrimination-based wrongful employment action -- so-called "mixed cases" -- the appeal of the MSPB action may be to any otherwise-proper federal district court.  See Coffman v. Glickman, 328 F.3d at 621-22; Williams v. Rice, 983 F.2d at 179-80; Wall v. United States, 871 F.2d at 1542.  The MSPB's decisions with respect to those discrimination-based claims, unlike all other claims, are reviewed by trial *de novo*.  See Coffman v. Glickman, 328 F.3d at 622; Williams v. Rice, 983 F.2d at 179 ("On the discrimination claim, the petitioner 'shall have the right to trial de novo by the reviewing court.'")(quoting 5 U.S.C. § 7703(c)).  Non-discrimination-based claims in these mixed cases are still reviewed under the arbitrary-and-capricious standard of 5 U.S.C. § 7703(c).  See Valles v. Donley, 292 Fed. Appx. 711, 714 (10th Cir. 2008); Williams v. Rice, 983 F.2d at 180.

### RELEVANT LAW OF THE WHISTLE-BLOWER PROTECTION ACT

The WPA, 5 U.S.C. § 2302(b), provides:

> Any employee who has the authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority . . . (8) take or fail to take, or threaten to take or fail to take, a personnel action with respect to any employee . . . because of . . . (A) any disclosure of information by an employee . . . which the employee . . . reasonably believes evidences . . . [(i) a violation of any law, rule, or regulation, or] (ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety . . . .

LaChance v. White, 174 F.3d 1378, 1380 (Fed. Cir. 1999)(quoting 5 U.S.C. § 2302(b)).[3]  The Federal Circuit has

> interpreted the WPA to require proof of four elements to establish a violation of section 2302(b)(8): "(1) the acting official has the authority to take, recommend, or

---

[3] 5 U.S.C. § 2302(a)(2)(A) defines "personnel action."  The term specifically includes "a . . . transfer, or reassignment," and includes -- by reference to Chapter 75 -- a 14-day suspension or a removal/dismissal.  See 5 U.S.C. § 2302(a)(2)(A)(iii) (incorporating actions under Chapter 75 as "personnel actions"); 5 U.S.C. § 7501(2) (defining suspension); 5 U.S.C. § 7521(explaining that Subchapter II of Chapter 75 applies to removal actions).

approve any personnel action; (2) the aggrieved employee made a disclosure protected under section 2302(b)(8); (3) the acting official used his authority to take, or refuse to take, a personnel action against the aggrieved employee; (4) the acting official took, or failed to take, the personnel action against the aggrieved employee because of the protected disclosure."

LaChance v. White, 174 F.3d at 1380 (quoting Frederick v. Dep't of Justice, 73 F.3d 349, 352 (Fed. Cir. 1996)).  "The burden of showing that a protected disclosure was made is upon the employee." Horton v. Dep't of Navy, 66 F.3d 279, 282 (Fed. Cir. 1995).  Moreover, courts should apply "the reasonable belief test by independently reviewing the basis for a party's beliefs as it relates to government misconduct."  LaChance v. White, 174 F.3d at 1380-81.  "[T]he proper test is this: could a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee reasonably conclude that the actions of the government evidence" the conduct described in 5 U.S.C. § 2302(b)?  LaChance v. White, 174 F.3d at 1381.

Where the employee seeks relief under the "violation of any law, rule, or regulation" prong, the employee must "identify a specific law, rule or regulation that was violated," but need not cite the precise provision at issue.  Langer v. Treasury, 265 F.3d 1259, 1266 (Fed. Cir. 2001).  To show gross mismanagement, the employee must show "a management action or inaction which creates a substantial risk of significant adverse impact upon the agency's ability to accomplish its mission. It must be more than *de minimis* wrongdoing or negligence."  Johnson v. Dep't of Justice, 104 M.S.P.R. 624, 634 (2007).  "An abuse of authority occurs when there is an arbitrary or capricious exercise of power by a federal official or employee that adversely affects the rights of any person or that results in personal gain or advantage to himself or to preferred other persons."  Id. at 636.

The burden for showing "gross" mismanagement or waste of funds is onerous.  See Elkassir v. Gen. Servs. Admin., 325 Fed Appx. 909, 912 (Fed. Cir. 2009); Johnson v. Dep't of Justice, 104 M.S.P.R. at 634 (finding that the gross mismanagement must "create[] a substantial risk of

significant adverse impact upon the agency's ability to accomplish its mission")(emphasis added). "'Gross waste of funds' is a more than debatable expenditure that is significantly out of proportion to the benefit reasonably expected to accrue to the government." Embree v. Dep't of Treasury, 70 M.S.P.R. 79, 85 (1996)(emphasis added). The Federal Circuit has recognized that the language of the statute contemplates a *de minimis* level of mismanagement or waste of funds, which does not rise to the "gross" level necessary to create a protected disclosure. Drake v. Agency for Int'l Dev., 543 F.3d 1377, 1381 n.1 (Fed. Cir. 2008)(explaining that the idea that there can exist "*de minimis*" mismanagement or waste of funds "comes from the statute itself[, which] refers to '*gross* mismanagement, a *gross* waste of funds, an abuse of authority, or a *substantial* and specific danger to public health or safety . . . .'")(emphasis in original).

## ANALYSIS

DeSantis raises several bases for his appeal of the MSPB's decision upholding the adverse employment action. The Court will address DeSantis' arguments seriatim and assume that they apply to DeSantis' non-discrimination complaints against the Defendant's employment actions. The Court will address -- in a separate opinion -- DeSantis' discrimination-based arguments under 5 U.S.C. § 7703(c), in ruling on the Defendant's motion for summary judgment. The Court ultimately concludes that the law and evidence presented at the administrative hearing supported the AJ's Initial Decision, and will therefore affirm the MSPB Final Order adopting the AJ's decision in DeSantis' mixed-case appeal. The Court concludes, however, that it lacks jurisdiction over DeSantis' appeal of the IRA asserting that his dismissal violated the WPA. The Court will dismiss that appeal without prejudice to it being re-filed in the Federal Circuit.

I.     **THE DEFENDANT DID NOT ENGAGE IN "OUTRAGEOUS" BEHAVIOR, AND THE LACK OF A WRITTEN DEFINITION FOR "ENDANGERMENT" DOES NOT MAKE DISMISSAL FOR FAILURE TO ADHERE TO THE POLICY IMPOSSIBLE.**

DeSantis' first argument begins in his section entitled "Summary of Basic Facts." In that section, he argues that the Defendant's officials testified that DeSantis failed to comply with a "written, national policy" in reference to the first two Charges, but that the ALJ found that DeSantis violated a "local" policy.[4]  DeSantis' Brief at 4 (emphasis in original).  He argues this finding is inconsistent with the ALJ's other finding that the Defendant's officials were credible witnesses.  He bases his claim of "outrageous conduct" on the idea that, because a witness testified to the existence of a written, national policy and the Defendant did not turn over such a policy in discovery, either the witness was lying or the Defendant was withholding documents, either one of which would be "outrageous conduct" worthy of the sanction of having DeSantis' dismissal undone.

The Court does not necessarily agree that the only two options are that Medina lied or the Defendant is withholding documents.  The possibilities are more varied, and many are considerably

---

[4] DeSantis also appears to make another factual argument in the section detailing what he calls the "Alien Endangerment Case," where he again insists that Sheffield never told him that there were aliens locked in a container on the truck that the Border Patrol agents stopped.  The AJ found Sheffield's testimony to the contrary to be more credible for numerous reasons.  Sheffield's story was more consistent with DeSantis' apparent disdain of immigration cases, DeSantis' cellular telephone records had discrepancies that made it appear DeSantis was avoiding responding to the information Sheffield provided, and DeSantis' answers to questions during the hearing were evasive and internally inconsistent.  See AR 1327-1329.  The Court finds no reason to upset the AJ's credibility determination based solely on DeSantis' continued insistence that he was, and is, telling the truth.  See Wilson v. Dep't of Army, No. 2009-3281, 2010 WL 21188, at *2 (Fed. Cir. Jan. 5, 2010)(stating that "the Board's credibility determinations are virtually unreviewable."); Wadhwa v. Department of Veterans Affairs, 353 Fed. Appx. 435, 438 (Fed. Cir. 2009)("As the finder of fact, the AJ is in a unique position to make credibility determinations and evaluate the evidence on the record before her.  Accordingly, the AJ's credibility determinations are 'virtually unreviewable'") (quoting Hambsch v. Dep't of Treasury, 796 F.2d 430, 436 (Fed. Cir. 1986)).  To the extent DeSantis asks the Court to reverse the MSPB's decision based upon this factual argument, the Court refuses to do so.  The reasons that the AJ gave are rational and the Court will not disturb them.

less sinister.  Nevertheless, DeSantis' premises fail on their own accord.  First, the Court has reviewed the sections of the administrative record which DeSantis cites, and none of them make any reference to a "written, national" policy.  Medina refers to a policy in his testimony, but does not refer to it as a national policy.  At most, he says that "the Office of Investigations has . . . policies regarding agents responding to any death cases involving aliens and any endangerment cases involving aliens," which might imply that the policy is national in scope, but such an interpretation is not absolute.  AR 2119:19-2120:9 (Medina).  If the policy was pressed upon him by his superiors, Medina may well have believed it was a national policy, even if it was not.  It makes no difference what Medina believed the policy's origin or scope to be, so long as: (i) a policy existed; (ii) Medina believed DeSantis violated the policy; and (iii) violation of such policy is worthy of, or should be considered in favor of, dismissal.  That Medina characterized it as an "Office of Investigations" policy and the AJ characterized it as a "local" policy does not deprive DeSantis of any fundamental rights.  The Court is unpersuaded by DeSantis' argument that this inconsistency in characterization represents the AJ upholding DeSantis' dismissal based on a different policy than Medina relied upon in dismissing DeSantis.  The content of the policy is the same; the difference is in characterization only.[5]

Furthermore, Medina did not call the policy a "written policy" or otherwise imply that it was contained in some official document.  He stated only that he has seen something about it before in written form, either a memorandum or an electronic-mail transmission.  David Conrad, DeSantis'

_____

[5] At another point in the record, Medina states that he recalled similar policies in Puerto Rico and Phoenix, Arizona.  See AR 2122.  Again, this testimony does not necessarily attest to a national policy.  A reasonable interpretation of this testimony is that Puerto Rico and Phoenix, Arizona have similar local policies.  And, again, it is irrelevant what Medina believed the scope of the policy to be so long as he knew what the policy stated and whether DeSantis violated it.

attorney, argued that the record shows either that Medina was lying on the stand about having seen a writing that contained this policy, or the Defendant is withholding documents.  See Tr. at 9:2-9 (Conrad).  The Court does not see the issue as so black and white.  Documents, from time to time, get lost.   Because the Defendant was unable to find the electronic-mail transmission or memorandum to which the witnesses referred does not necessarily mean that the Defendant found that document and refused to disclose it.  The witnesses, with the exception of DeSantis himself, uniformly recalled learning about the policy at one point or another.  See AR 1323 ("No other witness [than DeSantis] testified that they were unaware of a local policy regarding ICE taking alien death and endangerment cases for prosecution as of at least 2005.").  The Court does not believe that Medina's reference to the policy as one from the Office of Investigations, and recalling that he read something about it somewhere, is clear testimony to the existence of a written, national policy. Upon review of the record, the Court finds that the AJ's finding that a preponderance of the evidence demonstrated that a policy existed, local or otherwise, and that DeSantis violated it, was not arbitrary or capricious, was in accordance with the law, was obtained with appropriate procedures, and was supported by substantial evidence.  In other words, none of the bases for overturning an MSPB decision found in 5 U.S.C. § 7703(c) are present here.

At the hearing, Mr. Conrad seemed to argue that DeSantis' termination was wrongful unless the Defendant could provide some evidence of a written policy:

> [W]e're simply saying that the key issue between the Government and Mr. DeSantis during the administrative portion of this case was whether there was a policy that Mr. DeSantis knew of and should have followed and did not, and we asked repeatedly in discovery motions, motions to compel, and to the credit of the Government attorney, he made valiant efforts, we believe -- I have no reason to doubt that he made any inaccurate statements either to me or to the administrative judge -- that no such policy that Mr. DeSantis was being held accountable for existed.

Tr. at 8:17-9:1 (Conrad).  He has provided no authority for the proposition that only violation of a

written policy is grounds for dismissal.  Nevertheless, as the Defendant points out in her Response brief, the AJ did not sustain the first Specification of Charge 1 because, while he found that there was a local policy and DeSantis was aware of it, he also found that the Defendant failed to prove that DeSantis was aware that he could be subject to discipline for failure to comply.  Rather, it was only with respect to the March 25, 2007 incident that the AJ sustained Charge 1, and the AJ found that there was a written policy by that time.  See AR 1785 (memorandum dated January 26, 2007, regarding ICE response to cases involving alien death, injury, or juveniles).  In short, the Court need not address the issue whether a federal employee may be relieved of duty based on violation of an unwritten policy, as DeSantis was not dismissed for such conduct.

DeSantis also appears to argue that the AJ erred in affirming the lack-of-candor Charge -- and, presumably, the failure-to-follow Charge, though DeSantis does not make this argument in the context of that Charge -- because the policy which he violated lacked a definition of the word "endangerment," so it was impossible for him to know whether the situation that Sheffield described to him on the telephone in March of 2007 was an endangerment case.  The Court finds this argument unpersuasive.  As the Defendant points out in her response brief, the AJ could have concluded that a reasonable person would have recognized that aliens being locked in a box in the back of a truck constituted "endangerment" under the ICE policy, and that -- regardless of possible ambiguity in other situations -- it would not require a written definition for Medina, and DeSantis' other superiors, to conclude that DeSantis failed to abide by the policy.  Furthermore, the AJ found in his Initial Decision that "Sheffield maintains that he mentioned 'endangerment' to [DeSantis] due to the aliens being in a locked box," so DeSantis was at least on notice of one individual who considered the March 2007 incident to include an aspect of endangerment such that ICE should have taken over the investigation.  The Court is thus not convinced that the absence of a written definition

-14-

of "endangerment" is necessary for the failure-to-follow Charge.

The Court is not sure how the lack of a written definition of "endangerment" could effect the lack-of-candor Charge, because the basis of that Charge was not the failure to investigate the March 2007 incident, as required by the ICE policy, but the failure to provide full and truthful information regarding the DeSantis-Sheffield exchange to Wilson.  A lack-of-candor charge should be sustained if DeSantis' failure to provide all facts about the calls from Sheffield, and his failure to characterize those calls truthfully, was the basis for the lack-of-candor Charge.  See Ludlum v. Dep't of Justice, 87 M.S.P.R. 56, 62-64 (2000)(holding that "[a] 'lack of candor' charge may encompass a broader range of misconduct than a falsification charge," such as "not respond[ing] fully and truthfully" to questions from a superior, or "fail[ing] to mention uncertainty . . . thereby creating a[] [false] impression" as to the accuracy of the information given).[6]  DeSantis needs no definition of the word endangerment to accurately answer factual questions about a telephone call.  Ultimately, the Court finds that there was no error of law by the AJ or the MSPB affirming DeSantis' dismissal when there

_____

[6] DeSantis also argues in this section that his lack-of-candor Charge was upheld without substantial evidence because there is, he asserts, no evidence to support any "element of deception." Appeal at 16.  This assertion is incorrect.  The AJ found substantial evidence that DeSantis considered many of the day-to-day investigative activities of an ICE agent to be beneath him, and that his time would be more effectively spent investigating larger cases, like smuggling organizations or stash houses.  See AR 1328.  This attitude would give DeSantis a motive to avoid conveying pieces of information to his superiors that might cause those superiors to assign him to investigate more "mundane" cases.  The AJ noted that, based on his interpretation of the evidence:

> [DeSantis] did not want to be bothered with the more mundane immigration cases and instead wanted to devote his time and energies to making a "bigger and better" case by raiding a stash house where illegal aliens could be found, and where the possibility of breaking up a smuggling organization was more likely.

AR 1328.  A reasonable interpretation of the evidence is that, by refusing to report four aliens found in a locked box on the back of his truck, DeSantis could avoid "wasting his time" investigating this relatively small and unimportant case.  The Court finds no error in the AJ's opinion on this point.

was no official definition of "endangerment" as used in the ICE policy regarding when ICE should take over investigations that are initiated by Border Patrol interdictions.

## II.      THE AJ COMMITTED NO ERROR REGARDING HIS REFUSAL TO MERGE SPECIFICATIONS, AND ANY SUCH ERROR WAS HARMLESS.

DeSantis argues that the AJ committed error by failing to merge the two Specifications in Charge 2 and the first three Specifications in Charge 3.  See Appeal at 16-17.  The Defendant argues that merger is a doctrine that applies to Charges and not to Specifications.  See Response at 31 (citing Acox v. U.S. Postal Serv., 76 M.S.P.R. 111, 114 (1997)).  Further, she insists that any error is harmless, because at least one Specification from each Charge was sustained, from which one can imply that each Charge would have been sustained if the Specifications had been merged as DeSantis requested.

The Court agrees with the Defendant.  Because a Charge can be sustained so long as one Specification supporting that Charge is sustained, Burroughs v. Dep't of Army, 918 F.2d 170, 172 (Fed. Cir. 1990)("[W]here more than one event or factual specification is set out to support a single charge. . . , proof of one or more, but not all, of the supporting specifications is sufficient to sustain the charge."); Greenough v. Dep't of the Army, 73 M.S.P.R. 648, 657 (1997)("Proof of one or more, but not all, of the supporting specifications is sufficient to sustain a charge."), the Court can see that any error would have been harmless.  DeSantis asked for the two Specifications in Charge 2 be merged, but both Specifications in Charge 2 were sustained, so the only logical conclusion is that a merged Specification based on the same facts would also have been sustained.  Likewise with Charge 3, DeSantis asked that Specification 1, 2, and 3 of Charge 3 be merged.  Two of those Specifications were sustained, and one was denied.  Admittedly, it is not certain that a merged Specification, which included the facts of Specifications 1-3, would have been sustained.

Specification 4 of Charge 3, however, was also sustained.  Because that Specification would have remained unchanged if DeSantis' request had been granted, the Court is confident that the AJ would not have come to a different conclusion on Specification 4 of Charge 3, and Charge 3 ultimately would have been upheld, regardless whether the AJ came to a different conclusion on the merged Specification.

Furthermore, the Court also agrees that there was no error, harmless or otherwise.  The Specifications are descriptions of the underlying conduct upon which the Charge is based.  "A charge usually has two parts: (1) A name or label that generally characterizes the misconduct; and (2) a narrative description of the actions that constitute the misconduct." Otero v. U.S. Postal Serv., 73 M.S.P.R. 198, 203 (1997).  The Specifications are the "narrative description of the actions that constitute the misconduct," and there appears to be great leeway afforded the decision-making body in crafting those Specifications.  The cases DeSantis cites discuss the merging or splitting of Charges and not of Specifications.  See Southers v. Veterans Admin., 813 F.2d 1223, 1225-26 (Fed. Cir. 1987)(reversing MSPB's decision to split one charge of false testimony into 18 identical charges based on multiple, related false statements); Gunn v. U.S. Postal Serv., 63 M.S.P.R. 513, 516-17 (1994); Helmet v. Veterans Admin., 21 M.S.P.R. 74, 77 (1984).  The Court finds no error of law in the AJ's refusal to merge various specifications at DeSantis' request.[7]

_____

[7] DeSantis' argument regarding "stacking" or "merging" of Specifications also appears to argue that the AJ erred in his analysis of Specification 4 of Charge 3, the statements DeSantis made regarding the Virginia Tech shooting.  DeSantis argues that, although the Charge is characterized as "disruptive behavior," the Defendant at one point referred to the Virginia Tech comments as "threatening behavior."  He thus believes it should be analyzed under the reasonable-person standard of Metz v. Dep't of Treasury, 780 F.2d 1001 (Fed. Cir. 1986), which applies to Charges of threatening conduct.  Metz v. Department of Treasury applies, however, only "[w]hen an agency's charge is labeled as a threat." Rose v. U.S. Postal Serv., 109 M.S.P.R. 31, 34-35 (2007).  Neither the Charge nor the Specification at issue is labeled as a threat.  It is labeled as disruptive behavior.  In this context, the label is controlling, and the Court thus rejects this argument. See Otero v. U.S.

## III.   DESANTIS' NEW EVIDENCE REGARDING HIS DISABILITY IS INAPPLICABLE TO THIS PHASE OF THE COURT'S REVIEW.

One of DeSantis' arguments on appeal is that there exists new evidence of his disability that the AJ did not consider.  The Court notes that this argument goes only to DeSantis' discrimination-based claims and therefore is not subject to the arbitrary-and-capricious standard.  The Court will therefore decline to address this new evidence in this opinion and will reserve judgment on the issue until it rules on the Defendant's pending Motion for Summary Judgment.  See Motion for Summary Judgment and Memorandum in Support, filed February 26, 2010 (Doc. 43).

## IV.   THE COURT LACKS JURISDICTION OVER DESANTIS' APPEAL OF HIS IRA ALLEGING VIOLATION OF THE WHISTLEBLOWER PROTECTION ACT.

DeSantis' also appeals the Final Order of the MSPB relating to his claim of retaliation for whistleblowing.  He asserts that the MSPB's decision is based on an erroneous interpretation of the applicable law, misapplying the law defining a "protected disclosure," and that the Court should therefore set the decision aside.  Appeal at 21.  DeSantis' arguments on this issue are found in what

---

Postal Serv., 73 M.S.P.R. at 203-04 (not requiring agency to prove threat under Metz v. Department of Treasury where Charge was "improper conduct," notwithstanding that the narrative description of the misconduct accompanying the charge described the appellant's behavior as threatening); Rose v. U.S. Postal Serv., 109 M.S.P.R. at 34-35 (holding AJ erred for not applying Metz v. Dep't of Treasury test where Charge was "Unacceptable Conduct/Violent and Threatening Behavior Towards Co-Workers")(emphasis added).  One explanation for this rule is that Metz v. Dep't of Treasury related to threats of harm against an individual.  The test the Federal Circuit set forth was thus aimed at determining "whether the person speaking the threat intended to carry out the threat."  James v. Tablerion, 363 F.3d 1352, 1360 (Fed. Cir. 2004).  An employee can be disruptive to the point of necessitating removal by intentionally making comments that would cause his co-workers to doubt his mental or emotional stability, even if an objective observer would find it improbable that the employee would act no these remarks.  See AR 1336 ("While [DeSantis' coworker, Jeff Mayfield] suspected [DeSantis] may have been making the statements in a calculated effort to attain retirement benefits, [he] was also concerned for the safety of his coworkers.").  Finally, even if the MSPB in Otero v. United States Postal Service and Rose v. United States Postal Service misstated the criteria for application of the Metz v. Department of Treasury standard, the AJ's error would be harmless because the AJ sustained Specifications 1 and 3 of Charge 3.  See Burroughs v. Dep't of Army, 918 F.2d at 172.

-18-

appears to be a separate appellate brief appended to the back of the first one.  The Court finds no response to these arguments in the Defendant's brief.

The Court concludes that it lacks jurisdiction over DeSantis' appeal of his WPA claim. Appeals of MSPB Final Orders that do not include claims of unlawful discrimination can be filed only in the Federal Circuit.  See Coffman v. Glickman, 328 F.3d at 621 ("Review of a MSPB determination which does not involve claims of unlawful discrimination is conducted by the United States Court of Appeals for the Federal Circuit."); Williams v. Rice, 983 F.2d at 179-80 ("Normally, pursuant to 5 U.S.C. § 7703(b)(1), the Federal Circuit has exclusive jurisdiction over appeals from the MSPB[.]").  DeSantis pursued that claim in a separate administrative proceeding with a separate case number.  He filed the first appeal on September 10, 2007, and the second on February 11, 2008. See AR 464; AR 1309.  While both cases were heard on April 8, 2008 through April 10, 2008, the AJ wrote a separate opinion on the WPA issue, see AR 464 (Initial Decision in DE-1221-08-0195-W-1, dated July 18, 2008); AR 1309 (Initial Decision in DE-0752-07-0509-I-2, dated June 10, 2008), and the MSPB adopted the separate opinion by a separate Final Order.  See AR 2871 (Final Order in DE-1221-08-0195-W-1, dated Dec. 5, 2008); AR 2949 (Final Order in DE-0752-07-0509-I-2, dated Dec. 5, 2008).  DeSantis has merely appended his appeal of the MSPB's Final Order as to his WPA claim to the back of his appeal of the MSPB Final Order resolving his other claims.  The act of stapling one appeal to another does not transform the appeal of case DE-1221-08-0195-W-1 -- a case dealing only with a claim of retaliation under the WPA -- into a mixed-case dealing also with issues of unlawful discrimination.  DeSantis was entitled to appeal the MSPB Final Order in case DE-0752-07-0509-I-2 to this Court, as it involves issues of unlawful discrimination.  The same is not true of DE-1221-08-0195-W-1.

The only court with jurisdiction over DeSantis' appeal of the MSPB Final Order denying his

WPA claim is the Federal Circuit Court.  See Coffman v. Glickman, 328 F.3d at 621; Williams v. Rice, 983 F.2d at 179-80; 5 U.S.C. §§ 7703(b) & 7702.  The Court therefore dismisses DeSantis' appeal of his WPA claim for lack of jurisdiction.  Having addressed each argument raised by DeSantis in his appeal of the MSPB's Final Order adopting the AJ's Initial Decision -- other than those asserting that his dismissal was a form of discrimination, as to which DeSantis is entitled to a trial de novo -- the Court affirms the MSPB's decision to uphold the AJ's affirmance of DeSantis' removal.

IT IS ORDERED that the MSPB's Final Order affirming DeSantis' dismissal is affirmed in part.  All issues other than those regarding discrimination -- as to which Plaintiff Christopher DeSantis is entitled to a trial de novo under 5 U.S.C. § 7703(c) -- and DeSantis claim under the Whistleblower Protection Act -- as to which the United States Court of Appeals for the Federal Circuit has exclusive jurisdiction -- are affirmed.  DeSantis' appeal of Final Order DE 1221-08-0195-W-1 is dismissed for lack of jurisdiction.  The facts regarding DeSantis' claims of unlawful discrimination are entitled to de novo review, and the Court will address them in ruling on the Defendants' Motion for Summary Judgment and Memorandum in Support (Doc. 43).

_____
UNITED STATES DISTRICT JUDGE

Counsel:

David Mark Conrad
Spring, Texas

-- and --

Ronald Tonkin
Houston, Texas

-- and --

Cori A. Harbour
Harbour Law Firm, P.C.
El Paso, Texas

  *Attorneys for the Plaintiff*

Gregory J. Fouratt
 United States Attorney
Phyllis A. Dow
 Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

  *Attorney for the Defendant*