# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

CHRISTOPHER DESANTIS,

       Plaintiff,

vs.                             No. CIV 08-1205 JB/KBM

JANET NAPOLITANO, Secretary,
U.S. Department of Homeland Security,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion for Summary Judgment and Memorandum in Support, filed February 26, 2010 (Doc. 43).[1]  The Court held a hearing on April 29, 2010.  The primary issue is whether Plaintiff and Appellant Christopher DeSantis has shown that a genuine issue of material fact exists whether he suffers from a mental or physical impairment which substantially limits his ability to perform the major life activities of working and sleeping.  Upon reviewing the evidence that DeSantis and the Defendant provided, the Court concludes that DeSantis has failed to demonstrate a genuine issue of material fact as to the effects of his impairment and therefore will grant the Defendant's motion for summary judgment as to all of DeSantis' disability-discrimination claims.

## FACTUAL BACKGROUND

The United Stats Customs Service ("USCS") hired DeSantis in 1991, and he worked for that agency until the creation of the United States Department of Homeland Security, at which point the Immigration and Customs Enforcement Agency ("ICE") absorbed USCS.  See AR at 2695:2-7

---

[1] The Defendant represents that, before filing her motion, her counsel contacted DeSantis' counsel and learned that DeSantis opposes this motion.  See Motion at 1.

(DeSantis).[2] ICE's Office of Investigations is the investigative arm of the Border and Transportation Security Directorate within ICE.  See id. at 375.  Customs and Border Patrol ("CBP") is another arm of the Directorate.  See id. at 375.  CBP, however, is oriented toward interdiction -- identifying and apprehending the illegal aliens who are in the country -- and ICE is oriented toward investigating the cases that the CBP uncovers.  See id. at 2288:10-22 (Wilson); AR 378.

On November 16, 2004, the respective heads of CBP and ICE executed a Memorandum of Understanding ("MOU") governing interactions between ICE's Office of Investigations and CBP's Border Patrol ("BP").  See AR 377-395.  On February 2, 2007, the agencies supplemented the MOU.  See AR 391-395.  That MOU provides that BP has primary responsibility for interdiction, and OI has primary responsibility for investigation.  See AR 377-395.  It also provides that the local ICE Office of Investigations Special Agents in Charge ("SACs") and local BP Chief Patrol Agents ("CPAs") are to develop protocols governing when BP is to notify ICE of an interdiction event, and what ICE is to do upon notification.  See id. at 377-395.

At the time of his removal, DeSantis occupied the position of a CS-1811, and his work title was Senior Special Agent.  See id. at 199.  DeSantis was stationed in Deming, New Mexico at all times relevant to this case.  ICE's El Paso, Texas office oversees the Deming office.  See AR 2444:10-20 (AJ, Skelton).  DeSantis' immediate supervisor was Adam Wilson, see id. at 2284:12-24 (Wilson), his second-level supervisor was Deming Resident Agent in Charge Bart Skelton, see id. at 2386:5-12 (Skelton), and his third-line supervisor was Robert Barr, see id. at 2169:11-2170:5

---

[2] By agreement between DeSantis and the Defendant, the Defendant arranged to have the Merit Systems Protection Board's official record Bates stamped, and provided a stamped copy to both DeSantis and to the Court.  References to the record will be denoted "AR" and page numbers will refer to the Bates numbers in the lower right-hand corner of each pages, i.e., the Court cites to the record in the form AR [PAGE].  Citations to transcripts contained in the record are denoted AR [PAGE]:[LINE] ([SPEAKER]).

(Barr).  The Special Agent in Charge of the El Paso office was Roberto Medina.  See id. at 2105:23-2106:12 (Medina).

The duties of DeSantis' position involved conducting and coordinating investigations regarding "terrorists or terrorist organizations, large scale smuggling of drugs and other contraband, alien smuggling, human trafficking," and other criminal activities.  Id. at 398 (quoting addendum to the MOU). Part of the function of the position was to coordinate with other law-enforcement agencies, and "ensure that charges are prosecuted to the greatest extent possible to permanently destroy the operation of terrorist or criminal enterprises."  Id. at 399.  It was the policy of the ICE Office of Investigations to investigate and prosecute alien deaths, endangerment cases, and matters involving juveniles.  See id. at 2119:19-2122:1 (Medina)(testifying that the policy "was made crystal clear to everybody"); AR 2181:19-2183:5 (Barr)("I think it had been pretty much made known to the agents that if there were alien deaths involved, alien endangerment involved, or children involved, that we would respond, and we would handle those investigations."); id. at 2289:24-2290:24 (Wilson)("Q: . . . what was . . . agency policy with respect to responding to and prosecuting alien death and endangerment cases?  A: That we [ICE] would do it."); AR 2398:1-2399:10 (Skelton)("[I]t was clear to me -- and I thought everyone else in the SAC area -- that if there was a death, injury, or juvenile, that we will be responding."); id. at 2595:5-25 (Diaz)(describing a meeting at which he was told ICE "absolutely, positively" must respond to "injury cases, death cases, endangerment issues, those types of things").

1.     **Events Leading to DeSantis' Dismissal.**

Late on the evening of January 24, 2007, BP apprehended a group of aliens in the desert near Deming, and were informed that there was a dead alien somewhere.  BP agents eventually located the body.  See id. at 2291:16-2292:13 (Wilson).  DeSantis was the ICE duty agent on January 25,

2007, and BP agents called DeSantis concerning the dead alien.  Initially, he did not respond because there was nothing to investigate, but was later told that BP had located a guide who was associated with the deceased.  See id. at 2291:16-2292:13 (Wilson); id. at 2295:2-15 (Wilson).  Even after learning that there was a potential suspect to prosecute, DeSantis responded to the scene, but refused to handle the case, instead leaving BP to do the paperwork.  See id. at 2292:14-2293:2 (Wilson); id. at 2295:16-2298:3 (Wilson); id. at 2399:11-2400:3 (Skelton).  The Defendant asserts this action was contrary to policy, and DeSantis does not appear to contradict this assertion.  See Motion ¶ 18, at 5.  After the incident, Wilson told DeSantis that refusal to take the case was contrary to ICE policy, and Skelton issued a memorandum that refusal to take such cases was contrary to ICE policy.  See AR 2299:12-19 (Wilson); id. at 2300:12-19 (Wilson).  The Skelton memorandum outlined the policy concerning ICE prosecution of cases involving death, endangerment, and juveniles.  See id. at 2404:1-15 (Skelton)(explaining the purpose of the January 26, 2007 memorandum was "[t]o ensure that . . . all of the agents . . . were aware . . . that it was required of them to respond to death cases, endangerment cases, and cases involving juveniles, and prosecute the cases, if there was . . . a prosecutable investigation.").

On March 25, 2007, BP agents stopped a tractor trailer at a temporary checkpoint on a local highway near Deming, and discovered that there were aliens in the cab of the truck and in a locked compartment on the back of the truck.  See id. at 2514:6-14 (Sheffield); id. at 2515:20-2516:2 (Sheffield); id. at 2526:7-11 (Sheffield).  BP operations supervisor Christopher Mangusing instructed Supervisor James Sheffield to call the ICE duty agent.  See id. at 2545:16-25 (Mangusing); id. at 2547:21-2548:20 (Mangusing); id. at 2549:7-18 (Mangusing).  Sheffield called ICE and spoke with DeSantis, who was the ICE duty agent at that time, and told DeSantis about the stop and the fact that there were aliens in an endangerment situation.  See id. at 2511:11-21

(Sheffield); id. at 2516:3-2517:20 (Sheffield); id. at 2526:7-11 (Sheffield).[3]

DeSantis called Wilson, who told DeSantis to respond to the scene. DeSantis did not do so. See id. at 2304:10-2305:15 (Wilson); id. at 2517:25-2518:8 (Sheffield). DeSantis did not tell Wilson that there was any endangerment factor involved. See id. at 2305:4-7 (Wilson); id. at 2307:13-2308:1 (Wilson); id. at 2404:16-2406:10 (Skelton). As a result of DeSantis' actions concerning the March 25, 2007 incident, Wilson lost trust and confidence in DeSantis. See id. at 2315:20-2316:10 (Wilson). DeSantis did not like to do immigration cases and felt they were a waste of his time. See id. at 2302:19-2303:1 (Wilson); id. at 2591:20-2592:5 (Diaz). The Defendant argues that this dislike for immigration cases was the reason he refused to respond to the January 25, 2007 and March 25, 2007 incidents that BP reported.

During the evening of March 25, 2007, there was another tractor-trailer incident to which DeSantis and Special Agent Xavier Diaz responded. See AR 2406:23-2407:5 (Skelton); id. at 2592:6-16 (Diaz). At the BP station, DeSantis made insulting remarks to Diaz and some of the other BP agents, referring to them as "knuckle draggers." Id. at 2407:13-21 (Skelton); id. at 2600:4-2602:3 (Diaz). Skelton considered these remarks to be disruptive and unprofessional. See id. at 2407:24-2408:6 (Skelton); id. at 2440:7-16 (Skelton).

On April 20, 2007, DeSantis made remarks to SSA Jeffrey Mayfield about the Virginia Tech shooting that occurred four days earlier. The AJ quoted the following description of the final incident as follows:

> On April 20, 2007, four days after the shooting incident at Virginia Tech University, [DeSantis] entered the Deming Office of Investigations and asked Senior Special

_____

[3] The Defendant points out that DeSantis was rock-climbing on the morning of March 25, 2007, even though he was the duty agent. See Motion ¶ 25, at 5 (citing AR 2317:13-17 (Wilson)). DeSantis does not address that statement.

Agent Jeff Mayfield if the codes to enter the building had been changed because of [him].   After a brief conversation with SSA Mayfield, [DeSantis] then made statements to the effect of "I can't figure out if they (ICE) are out to get me or if I am just paranoid," "You know I was watching the shooting on TV (reference to Virginia Tech) and the people they were interviewing were just saying how all the signs were there, yet no one did anything about it," "Do I have to come in the office and start shooting people before they (ICE) believe that I'm injured?  They just don't get it," "Six months ago I would have went on a shooting rampage if I had come in and the locks were changed," "I can't stand all the backstabbing and lies that go on around here," "I'm going to pack some things from my office, I'm not going to be stealing anything."

AR 1309-1348.   See id. at 2412:15-2414:6 (Skelton); id. at 2576:13-2578:12 (Mayfield); Motion ¶ 29, at 7.  Skelton considered these statements to be disruptive to the office and was concerned about them.   See AR 2414:18-2415:2 (Skelton); id. at 2417:10-16 (Skelton).

On May 10, 2007, ICE's Disciplinary and Adverse Actions Panel proposed to remove DeSantis from his position based on three charges: (i) "Failure to Follow Policy, Procedure, Practice, Protocol or Rule"; (ii) "Lack of Candor"; and (iii) "Disruptive Behavior."  AR 276-303; id. at 2115:23-2116:6 (Medina).  DeSantis responded on June 28, 2007, with counsel's assistance. See id. at 259-269.   On August 10, 2007, Medina sustained all Charges and underlying Specifications in the Panel's proposal and removed DeSantis from his position, effective August 15, 2007.  See id. at 199-217; id. at 2105:23-2106:3 (Medina); id. at 2116:7-11 (Medina); id. at 2119:13-2132:19 (Medina).

     **2.**     **DeSantis' Claim of Disability.**

When DeSantis was a child -- approximately seven or eight years old -- he discovered his sister's body after she had drowned.  See Plaintiff's Response to Defendant's Motion for Summary Judgment Exhibit 3, at 6:16-20, filed March 29, 2010 (Doc. 48)("Response"); Response Exhibit 3,

at 19:7-21:2.[4]  His sister survived for several years in a vegetative state.  See Response Exhibit 3, at 20:2-21:2.  His father blamed him for his sister's death for several years.  See id. Exhibit 3, at 23:5-24:20; AR 1956:21-1958:7 (Grenko).  After discovering his sister's body, DeSantis developed Post-Traumatic Stress Disorder ("PTSD").  See Response Exhibit 3, at 154:5-155:8; Deposition of Anthony Grenko at 8:3-9:6 (taken August 7, 2009), filed March 29, 2010 (Doc. 48-4); Grenko Depo. at 17:20-18:21; id. at 33:15-18; id. at 35:13-19.[5]

In mid-2005, ICE intended to send DeSantis to New Orleans, Louisiana as part of a response team in the aftermath of Hurricane Katrina, and then later send him to Albuquerque, New Mexico. See AR 1961:16-1963:12 (Grenko).  At his request, another agent was sent in his place to New Orleans.  See DeSantis' Depo. at 154:20-155:12 (Doc. 48-3); id. at 230:16-232:5.  DeSantis asserts -- through the testimony of his therapist, Grenko – that this proposed assignment to Albuquerque was a form of "satisticness and brutality," and that Grenko could not understand why the Defendant would cause a constant re-enactment of a traumatic event of DeSantis' childhood.  See Response

---

[4] Exhibit 3 to DeSantis' response appears to be pages from a deposition of DeSantis; however, there is no cover page stating the date on which it was taken or describing who was present.  This omission is notable given that Exhibit 4 has a cover page showing it to be excerpts from a deposition of Licensed Social Worker Anthony Grenko taken August 7, 2009.  The Court will not explore the issue of the inadmissibility of the statements in Exhibit 3, however, because: (i) they do not change the outcome of the motion; and (ii) the Defendant does not challenge them.

[5] DeSantis insists he developed PTSD immediately after discovering his sister's body, see Response at 4, but the Defendant asserts that DeSantis' evidence does not clearly state when he developed PTSD, see Defendant's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment [Doc. No. 48] at 5, filed April 22, 2010 (Doc. 53)("Reply").  The Court does not believe resolving this factual dispute changes the outcome of this motion, but finds that DeSantis cites to deposition testimony in which Grenko states: "I think the PTSD incepted and developed the day that his sister drowned, and it just deteriorated from there.  And by the time he was college age, he had a florid, active, incredibly intensive case of PTSD."  Grenko Depo. at 35:13-19.

at 7 (citing AR 1962-1963).[6]  The Defendant points out that these events occurred in August of

2005, and that DeSantis did not fill out the "Traumatic Injury and Claim for Continuation of

Pay/Compensation" form indicating his aversion to being exposed to dead aliens until

September 10, 2005.  Response Exhibits N-O.  Furthermore, regarding the Defendant's apparent

desire to have DeSantis re-enact a traumatic childhood event -- the discovery of his sister's body

after she had drowned -- DeSantis' therapist, Grenko, admitted that, so far as he knew, none of

DeSantis' superiors were aware of that particular childhood event.  See  Grenko Depo. at 75:6-15.

DeSantis now contends that he suffers from PTSD as a result of responding to a report of a

dead illegal alien's body found in the desert in 2005.  See Plaintiff's Original Complaint, Demand

for Jury Trial and Appeal of the Final Decisions of the Merit Systems Protection Board ¶¶ 25-26,

at 5, filed December 30, 2008 (Doc. 1)("Complaint").  The body was disfigured and putrefied.  See

DeSantis Depo. at 99:18-102:16.[7]  DeSantis further asserts that a "reasonable accommodation" for

_____

[6] It is unclear why Grenko believed that assignment to Albuquerque, New Mexico would be a form of "sadisticness and brutality," especially given that it is unclear what DeSantis' duties would be in Albuquerque and that Albuquerque is substantially farther from the Mexico border than Deming.  DeSantis also attributes the decision to assign DeSantis to Albuquerque to Barr, and points out that Skelton admitted telling DeSantis that the assignment was to help him deal with his alien-death-case issues.  See Response at 7 (citing AR 2426).  The Court also believes that DeSantis intended to cite AR 1962-1963, rather than AR 1062-1963, as the pin-cite for his sixteenth factual statement.

[7] DeSantis asserts that the body was "horribly disfigured and bloated and putrefied from being in the desert."  The Defendant contests this description, arguing that the testimony cited for this statement is that of Grenko, who was not present at the scene.  Grenko's statements are therefore either hearsay -- if Grenko learned these facts from DeSantis -- or facts to which Grenko has no personal knowledge.  The deposition of DeSantis, however, to which the Defendant cites for another proposition, and which is properly included in the record, supports the "disfigured" and "putrefied" state of the body that he encountered.  The Court, construing the undisputed evidence in the light most favorable to the non-moving party, accepts this fact as established for the purpose of this summary-judgment motion.  The Court agrees with the Defendant, however, that the evidence does not support the remainder of DeSantis' alleged fact: "When [DeSantis] had to deal with another disfigured body he sought help to deal with the stress . . . ."  Response at 5 (emphasis added).  The

his alleged disability would have been to transfer him to the Salt Lake City area where his wife was stationed and where it would be unlikely that he would have to deal with "dead, disfigured, bloated aliens in the desert."  Complaint ¶¶ 50-51, at 8.

PTSD is a well-understood disorder, and DeSantis' case was, at times, pronounced.  See AR 1948:4-1949:4 (Grenko).[8]  The Defendant concedes that a PTSD reaction is generally not something that can be "faked" because some of the reactions are physiological.  See Response at 5 (citing AR 1952); Reply at 7.  The Defendant further notes that, although Grenko's administrative-hearing testimony states that DeSantis' PTSD was "pronounced," Grenko does not provide a time-frame.  The Defendant points to testimony that indicates that, as of February 6, 2006, DeSantis' prior psychologist found that DeSantis had his PTSD symptoms under control.  See Response at 5-6; Deposition of David A. Sachs at 25:2-21 (taken August 7, 2009), filed April 22, 2010 (Doc. 53-2); Letter from David Sachs to Whom it May Concern (dated May 10, 2006), filed April 22, 2010 (Doc. 53-3).  Also, Grenko acknowledged that, during the mid-point of his treatment with DeSantis,

─────────────────────

Court has found no evidence for DeSantis' contention that there were two "disfigured dead body" situations.  Some of DeSantis' deposition testimony indicates that he encountered a second dead body on June 16, 2006, but that he "handled [it] better" than he had handled the earlier, July 2005 incident.  DeSantis' Depo. at 145:14-146:18.  He even stated that he did not recall having any nightmares after this second incident, unlike his experience with "the first charred guy." Id. at 146:13-18.

[8] The Defendant challenges this fact, arguing that DeSantis' evidence that PTSD is "well-understood" is inadmissible hearsay and that the document DeSantis attached to his response indicates PTSD is not very well understood.  See Response at 5.  While the Defendant is correct that evidence must be admissible to be used to rebut a summary-judgment motion, see Johnson v. Weld County, Colo., 594 F.3d 1202, 1209-10 (10th Cir. 2010); Wright-Simmons v. City of Okla. City, 155 F.3d 1264, 1268 (10th Cir. 1998), and that the document DeSantis attached to his response is inadmissible without some predicate, see Response Exhibit 5, the page of the administrative record that DeSantis cites includes a statement by Grenko that "[p]osttraumatic stress disorder is very well understood," AR 1948:20-21 (Grenko).  Taking this evidence in the light most favorable to the non-moving party, as it must, the Court concludes that, for the purpose of this motion, DeSantis has established that PTSD is a well-understood disorder.

DeSantis appeared to be managing his PTSD symptoms.  See Response at 5-6; Grenko Depo. at 5:24-6:12 (Doc. 53-4); id. at 22:20-23:5; id. at 47:2-16.  Thus, the undisputed evidence shows that DeSantis' PTSD symptoms fluctuated from September 2005 until his removal in August of 2007.[9]

DeSantis was at some point referred to the Employee Assistant Program ("EAP"), through which he first contacted Dr. David Sachs, a psychologist under contract with DHS.  DeSantis characterizes this referral and contact as "ask[ing] the Agency's help in dealing with his PTSD," Response at 5, but the Defendant points out that DeSantis had not, at that point, been diagnosed with PTSD, see Reply at 7.  DeSantis filled out a "Traumatic Injury and Claim for Continuation of Pay/Compensation" form based on having seen the dead alien.  See Reply Exhibit N.  In the form, DeSantis refers to "Post Traumatic Stress," but that was DeSantis' characterization of his disorder. Reply Exhibits N-O.  This likely would have put the Defendant on notice of DeSantis' belief that he suffers from PTSD, but it is unclear whether it would notify them that he truly suffered from that disorder.  Because it is a fair inference, however, the Court will infer that the Defendant was aware

---

[9] DeSantis asserts that he "saw his loyalty to the Agency as a major aspect of his life -- something he held very dearly to" and that "he saw the Agency 'turn[] on him completely . . . despite the advice of four medical practitioners."  Response at 4 (citing AR 1958-1959).  The Defendant objects to these facts on two bases: (i) the citation is to Grenko's testimony, not DeSantis'; and (ii) Grenko admitted that he did not know whether the Agency was aware of the opinions of the "four medical practitioners" to which DeSantis refers.  Response at 6; AR 1953:6-15 (Grenko)(testifying that, while he produced reports, he did not know if they had been circulated); id. at 1971:20-24 (Grenko)(testifying that he "submitted much of the information that I submitted . . . through Mr. DeSantis.");  Grenko Depo. at 22:5-23:5 (describing a medical report that he gave to DeSantis to give to "whatever advocates or managers he thinks it's appropriate to give to," but admitting he does not know to whom DeSantis gave it); id. at 75:6-15 (Grenko)(admitting that he does not know if DeSantis' superiors ever knew of DeSantis' past family trauma).  The Court finds that the evidence provided -- Grenko's testimony -- does not support the fact that the Defendant knew about the advice of four medical practitioners.  It establishes only that Grenko produced reports and provided them to DeSantis.  Without the additional fact that DeSantis provided them to one of his supervisors, there is no evidence that the Agency was aware of the opinions of the "four medical practitioners" to which Grenko referred in his testimony.

that DeSantis had, at some point, been diagnosed with PTSD.

Grenko prepared several reports regarding DeSantis' condition, and ICE did not respond to any of them or request additional information.  See AR 1935:6-1955:19 (Grenko).  Grenko also testified, however, that he did not know whether any reports he prepared -- or that any other person who assessed DeSantis prepared -- were ever provided to any of DeSantis' supervisors.  See AR 1953:6-15 (Grenko)(testifying that, while he produced reports, he did not know if they had been circulated); AR 1971:20-24 (Grenko)(testifying that he "submitted much of the information that I submitted early on through Mr. DeSantis."); Grenko Depo. at 22:20-23:5; id. at 24:9-13; id. at 75:6-15.  The Defendant thus asserts that the Agency had no notice of DeSantis' PTSD diagnosis and therefore had no reason to request additional information.  See Reply at 8.[10]  DeSantis nevertheless asserts that management "was aware of the PTSD issues and the stress issues that [DeSantis] was under," and that Skelton had seen at least one report from a medical professional.  Response at 7 (citing AR 2416 and AR 2424-2426).  Indeed, the citations appear to demonstrate that Skelton was aware of some medical report indicating that DeSantis had some issue regarding the stress that he had been under, and may have therefore been on notice that DeSantis was suffering from some psychological ailment.  See AR 2416:14-2427:11 (Skelton).  The testimony also indicates that Skelton was aware that DeSantis' issues related to exposure to dead bodies of aliens.  See id.  The testimony does not, however, indicate at what point Skelton became aware of these facts, and does

---

[10] DeSantis includes as an undisputed fact that Grenko stated "it's almost inconceivable, to me, in a sense, that a law enforcement agency on the border, dealing with drug interdiction, wouldn't be responsive to posttraumatic stress, those kinds of problems, It's a routine understanding." Response at 6 (citing AR 1955).  The Court has looked at the record and agrees that Grenko did make this statement.  The Court finds that it is only relevant, however, to the extent that DeSantis can provide some evidence that relevant ICE officials were aware that DeSantis had been diagnosed with PTSD.

not clearly indicate that Skelton was aware DeSantis has been diagnosed with PTSD.  Because that Skelton knew these facts is a fair inference, however, the Court will make that inference when ruling on this motion for summary judgment.

On March 14, 2006, DeSantis married Shannon McCall DeSantis, a Supervisory Border Patrol agent in Deming.  At that time, Ms. DeSantis had tentative notification that she was probably going to be given a position with ICE in Salt Lake City.  See Vol. I, Deposition of Christopher DeSantis, at 120:19-25 (taken August 21, 2009), filed February 26, 2010 (Doc. 43-1)("DeSantis Depo.").  DeSantis began to request transfers to Utah to be with his wife beginning in April 4, 2006. See DeSantis Depo. at 144:23-145:4; Memorandum by Christopher DeSantis to Brock Nicholson, Acting Special Agent in Charge (dated April 4, 2006), filed February 26, 2010 (Doc. 43-2). DeSantis made other requests dated June 9, 2006, November 13, 2006, November 15, 2006, January 29, 2007, and March 22, 2007.  See DeSantis Depo. at 148:15-149:3; id. at 209:8-17; id. at 218:20-25; 246:15-18; Motion Exhibits C-Q.

DeSantis asserts that these requests "all had the same ultimate goal -- to be removed from the stressor(s) of having to deal with the dead bodies of aliens found in the desert."  Response at 6 (citing AR 1955).  The Defendant notes, and the Court must agree, that if this was DeSantis' goal, he kept it hidden from the Defendant.  None of the transfer requests cite any reason other than his desire to be closer to his wife in Salt Lake City.  See Motion Exhibits C-Q.  In none of DeSantis' requests for transfer did he submit any medical documentation or cite any medical condition in regards to the transfer request.  See AR 2820:21-2821:1 (DeSantis); DeSantis Depo. at 152:3-12; id. at 197:2-22; id. at 209:17-210:2; id. at 221:1-6; id. at 246:19-249:2.  DeSantis never submitted any request for a reasonable accommodation to his supervisor, Wilson, nor did he mention any medical condition when requesting transfer to Utah.  See AR 259-269; id. at 2368:10-23 (Wilson);

id. at 2370:9-18 (Wilson).  DeSantis also never submitted a request for a reasonable accommodation to Skelton.  See AR 2396:10-2397:4 (Skelton).

The only time DeSantis submitted medical documentation was in response to a Workers Compensation claim.  See AR 2821:3-6 (DeSantis).  Wilson did not learn that DeSantis was diagnosed with PTSD until after he had taken leave.  DeSantis did not state that he was disabled in response to the initial proposal that he be removed from service, and did not submit any medical documentation at that time.  See AR 2138:13-22 (Medina).

On April 11, 2007, Skelton notified DeSantis that the Agency had concerns about his fitness for duty as a weapons-carrying special agent.  See AR 312 (Letter from Skelton to DeSantis (dated April 11, 2007)).  On April 27, 2007, two doctors who had concluded that DeSantis suffered from PTSD symptoms contacted Maria Nunez, an employee at the Department of Labor, and suggested that DeSantis take a forty-five-day leave of absence, citing PTSD and various symptoms as the reason.  See Letter from Deborah Deetz, CNP, and Gabriel Hernandez, MD to Maria Nunez (dated April 27, 2007), filed March 29, 2010 (Doc. 48-9).  The Defendant does not contest this assertion, stating that this suggestion came after DeSantis submitted a form requesting leave, which stated:

> Even though I am taking anti-depressant medication, my depression has worsened and I am constantly plagued by an overwhelming sense of dread and sadness.  I feel a total loss of control as though I am in a tail spin of sorts. . . . I fear that my mental state has deteriorated to the point where it has adversely affected my ability to effectively perform the requirements and duties of my job.

Reply Exhibit P, at 4.  The Defendant asserts that this form was the first time DeSantis had furnished the Agency with any medical documentation concerning his diagnosis of PTSD.  See Response at 10-11 (citing AR 1601-1605).

While employed with the USCS, DeSantis did not work on cases involving illegal aliens entering the United States and, consequently, did not have to deal with aliens found in the desert,

dead or otherwise.  He asserts that, if he had been transferred, as he had requested, his PTSD "probably would not have gained the momentum and intensity that it gained" from having to encounter deceased aliens.  Response at 5 (citing AR 1959-1960 (Grenko)).  The Defendant points out, however, that Grenko testified that DeSantis' distance from his wife also influenced his emotional well-being and PTSD, and that Mrs. DeSantis' decision to take a job in Salt Lake City, not by any act by the Agency, caused the distance.  See Reply at 6 (citing AR 1959 (Grenko)).

DeSantis challenged a threatened fourteen-day suspension and his removal from service through the MSPB via two separate actions.  The first, filed September 10, 2007, challenged his August 15, 2007 removal from his position as an ICE agent.  See AR 1309.  The second was an individual right of action ("IRA") challenging the agency's threat to suspend him for fourteen days, although the suspension never occurred, because Medina decided to dismiss DeSantis first.  See AR 464-469.  He alleged the suspension was retaliation for whistle-blowing activity, in violation of the Whistleblower Protection Act of 1989 ("WPA").  See id.  Both cases were assigned to the same AJ for Initial Decisions.

On June 10, 2008, the AJ issued the first Initial Decision, in which he sustained all three Charges[11] against DeSantis and upheld his dismissal.  The first Charge was "Failure to Follow Policy, Procedure, Practice, Protocol or Rule."  The AJ rejected Specification 1 of Charge 1 --

---

[11] A Charge is a basis for an adverse employment action, such as a dismissal.  "A charge usually has two parts: (1) A name or label that generally characterizes the misconduct; and (2) a narrative description of the actions that constitute the misconduct."  Otero v. U.S. Postal Serv., 73 M.S.P.R. 198, 203 (1997).  The narrative description of the action is generally broken down into one or more "specifications," which describes the facts giving rise to the Charge.  For example, in this case, DeSantis was accused of three Charges, one of which was Disruptive Behavior.  The Disruptive Behavior Charge was supported by four Specifications.  Three of the Specifications were instances of insulting or derogatory remarks about the BP and/or another agent, and the fourth Specification described disturbing remarks that DeSantis made about the Virginia Tech shooting, suggesting that he might take violent action against the agency or particular agents.

regarding DeSantis' failure to respond to the January 2007 incident -- because, although he found DeSantis was aware of the policy regarding ICE taking control of investigations involving alien death or endangerment in January of 2007, it was unclear whether DeSantis knew failure to comply with that policy could result in discipline.  The AJ upheld Specification 2 of Charge 1, however, dealing with DeSantis' failure to respond to the March 2007 call, because DeSantis knew by March of 2007 that failure to comply with the policy could result in discipline.  See AR 1320-1332.  The AJ upheld the second Charge, "Lack of Candor," on both proffered Specifications, and upheld the third Charge, "Disruptive Behavior," on three of the four Specifications.  AR 1332-1336.  The AJ rejected DeSantis' remaining defenses and affirmed his dismissal.  See id. at 1336-1344.  The AJ also denied DeSantis' claims that his suspension violated the WPA, finding DeSantis had not proven he made a protected disclosure that was a contributing factor to the dismissal.  See AR 464-474. DeSantis appealed both Initial Decisions to the MSPB, which sustained both Initial Decisions by Final Order.  See AR 2871-2871; id. 2950-2951.

## PROCEDURAL BACKGROUND

After the MSPB issued its decision, DeSantis filed an original action in this Court and simultaneously appealed the MSPB's Final Orders.  The Court has issued a Memorandum Opinion and Order, dated May 20, 2010 (Doc. 57), affirming the Final Orders of the MSPB on all issues except those relating to DeSantis' allegations of disability discrimination and those over which the Court lacked jurisdiction. The Court now addresses the discrimination issues only.

DeSantis is entitled to a trial *de novo* on the factual basis of his disability-discrimination claim.  DeSantis' Complaint asserts that "[w]ithin the appeal to the MSPB [DeSantis] claimed that his termination was due to his disability (Post Traumatic Stress Disorder and separation anxiety)." Complaint ¶ 14, at 3.  DeSantis' sole discrimination claim is that his removal from ICE was

discrimination, in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 791, based on his disabilities of PTSD and separation anxiety.  See Complaint ¶¶ 42-61, at 7-9.[12]

The Defendant has filed this motion for summary judgment pursuant to rule 56 of the Federal Rules of Civil Procedure, alleging that there is no genuine issue of material fact that DeSantis is an individual with a disability as that term is defined in the Rehabilitation Act.  DeSantis responds with a convoluted flurry of paragraphs, loosely grouped under headings that give some vague indication of the information that might be found below that heading.  He asserts that he claims the Defendant's agency discriminated against him under two theories: (i) failure to accommodate; and (ii) disparate treatment.  See Response at 11.[13]

_____

[12] In his response brief, DeSantis attempts to characterize the "only question before the court" as "whether the Plaintiff was discriminated [against] because of his PTSD when the Agency denied his repeated requested transfers (accommodations) which his medical clinicians testified likely would have allowed him to be a productive agent."  Response at 2.  The Court agrees with the Defendant, however, that the sole issue for the Court is the one raised in DeSantis' Complaint and which was fully vetted below, whether DeSantis' removal from his position as a federal employee was discriminatory based on his disability.  See Coffman v. Glickman, 328 F.3d 619, 624 (10th Cir. 2003)("If the employee chooses to appeal to the MSPB, . . . the employee will have a hearing at which he or she must raise his or her claims of discrimination and present evidence in support of those claims in order to exhaust the administrative remedy.").  The Court will, however, explore whether the Defendant failed to provide reasonable accommodations, as an incident to her alleged unlawful discriminatory discharge.

[13] DeSantis' response brief was substantially lacking procedurally, as the Defendant points out in her reply brief.  See Reply at 1-4.  The response appears to try to incorporate portions of DeSantis' brief on appeal of the MSPB's Final Orders, most of which lack citation to the record or other evidence, see Response at 2-3, and the response fails to challenge the alleged undisputed facts in the Defendant's motion in individual numbered paragraphs, as D.N.M. LR-Civ. 56.1 requires, see id. at 3-7.  Because DeSantis did not properly challenge any of the Defendant's alleged facts, the Court accepts them as true.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the statement of the movant will be deemed admitted unless specifically controverted.").  The Court will not penalize DeSantis for these deficiencies other than to deem the Defendant's facts admitted unless expressly controverted elsewhere in DeSantis' brief.  The Court will also assume that the parties have specified all facts the Court will need to resolve this motion in the briefing, and have provided the proper citations and evidence to support those facts.  See Cross v. Home Depot, 390 F.3d 1283, 1290 (10th Cir. 2004)("[O]n a motion for summary judgment, 'it is the responding party's burden

## THE REHABILITATION ACT

"The Rehabilitation Act prohibits discrimination against an 'otherwise qualified individual with a disability'" and creates a private right of action in favor of a qualified victim of such discrimination. McGeshick v. Principi, 357 F.3d 1146, 1149 (10th Cir. 2004)(quoting 29 U.S.C. § 794). To establish a prima-facie case of discrimination under the Rehabilitation Act, a plaintiff must show: (i) he is disabled as defined under the Act; (ii) he is "otherwise qualified" for his position; (iii) he works for a program receiving federal financial assistance; and (iv) the program has discriminated against him. See McGeshick v. Principi, 357 F.3d at 1150 (citing Schrader v. Fred A. Ray, M.D., P.C., 296 F.3d 968, 971 (10th Cir. 2002), and Powers v. MJB Acquisition Corp., 184 F.3d 1147, 1151 (10th Cir. 1999)). Section 504(d) of the Rehabilitation Act states that "[t]he standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standard applied under the . . . Americans with Disabilities Act of 1990 [("ADA")] . . . ." Jarvis v. Potter, 500 F.3d 1113, 1121 (10th Cir. 2007)(quoting § 504(d)).[14]

---

to ensure that the factual dispute is portrayed with particularity, without . . . depending on the trial court to conduct its own search of the record.'")(quoting Downes v. Beach, 587 F.2d 469, 472 (10th Cir. 1978)); Mitchell v. City of Moore, 218 F.3d 1190, 1199 (10th Cir. 2000)("The district court was not obligated to comb the record in order to make [the plaintiff's] arguments for him."); Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1546 (10th Cir. 1995)("Without a specific reference, 'we will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury.'")(quoting Thomas v. Wichita Coca-Cola Bottling Co., 968 F.2d 1022, 1025 (10th Cir. 1992)). The Court will not pour over the administrative record to uncover evidence or facts that the parties should have brought to its attention, but neither will it be blind to facts not specifically pointed out if the Court comes across them in reviewing the pages of the record to which the parties cite.

[14] Because the standards are the same, the Court relies, as the Tenth Circuit generally does, on both Rehabilitation-Act cases and ADA cases in resolving this motion for summary judgment. See Corley v. Dep't of Veterans Affairs, 218 Fed. Appx. 727, 732 (10th Cir. 2007)("The standard applied under the ADA is also used to determine whether an act of discrimination violates the

An employer can discriminate against an individual with a disability by failing to make a reasonable accommodation to a known physical or mental disability of an otherwise qualified employee.  See 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9.  To establish a prima-facie case of failure to accommodate, a plaintiff must show: (i) he is disabled within the meaning of the Act; (ii) he is a "qualified" individual; (iii) the defendant was aware of the plaintiff's disability; (iv) the plaintiff needed an accommodation, meaning a causal relationship existed between the disability and the request for accommodation; and (v) the defendant failed to provide the necessary accommodation.  See Massari v. Potter, No. 04-CV-02306-EWN-MJW, 2006 WL 318658, at *14 (D. Colo. Feb. 9, 2006).[15]  "An employee has the initial duty to inform the employer of a disability before [Rehabilitation-Act] liability may be triggered for failure to provide accommodations -- a duty dictated by common sense lest a disabled employee keep his disability a secret and sue later for failure to accommodate."  Beck v. Univ. of Wis. Bd. of Regents, 75 F.3d 1130, 1134 (7th Cir. 1996).  See EEOC v. Convergys Customer Mgmt. Group, Inc., 491 F.3d 790, 795 (8th Cir. 2007)("[T]he employee must provide relevant details of his disability and, if not obvious, the reason that his disability requires an accommodation."); Conneen v. MBNA Am. Bank, N.A., 334 F.3d 318, 332 (3d Cir. 2003)("[E]ither by direct communication or other appropriate means, the employee 'must make clear that the [he/she] wants assistance for his or her disability.'")(quoting Jones v. United Parcel Serv., 214 F.3d 402, 408 (3d Cir. 2000)); Gantt v. Wilson Sporting Goods

---

Rehabilitation Act.  We therefore rely on cases applying the ADA in the course of this order and judgment.")(internal citations omitted).

[15] DeSantis agrees that this is the appropriate standard.  See Response at 8-9.  It is also fairly inferred from Tenth Circuit case law.  See Whitney v. Bd. of Educ. of Grand County, 292 F.3d 1280, 1285 (10th Cir. 2002)("If a mental limitation is not 'known' to the employer, then any failure to accommodate that limitation is not discrimination within the meaning of the ADA."); Taylor v. Pepsi-Cola Co., 196 F.3d 1106, 1109-11 (10th Cir. 1999).

Co., 143 F.3d 1042, 1046 (6th Cir. 1998)("The Commission's interpretive guidelines indicate that generally 'it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed.'")(quoting 29 C.F.R. pt. 1630 App. § 1630.9); id. at 1046 n.4 ("It is well settled in cases brought under the Rehabilitation Act of 1973 . . . the precursor to the ADA, that reasonable accommodation is not at issue if the plaintiff has never requested accommodations."). The employee must provide "the employer with enough information that, under the circumstances, the employer can fairly know of both the disability and the desire for an accommodation." Ballard v. Rubin, 284 F.3d 957, 962 (8th Cir. 2002)(quoting Taylor v. Phoenixville Sch. Dist., 174 F.3d 142, 158-59 (3d Cir. 1999)); Paris v. Dep't of Treasury, 104 M.S.P.R. 331, 339 (2006)("[A]n employee . . . has a general responsibility to inform his employer that he needs accommodation for a medical condition.").

In both disability-discrimination and failure-to-accommodate claims, a plaintiff must show he is a person with a disability within the meaning of the Act. The person has a disability if he or she has "a physical or mental impairment that substantially limits one or more major life activities." 29 U.S.C. § 705(9)(B).[16] See McGeshick v. Principi, 357 F.3d at 1150 ("[T]he Rehabilitation Act

_____

[16] Effective January 1, 2009, 29 U.S.C. § 705(9)(B) was amended to define disability "for the purposes of . . . subchapter[] . . . V . . . of this chapter [29 U.S.C. §§ . . . 790 et seq.]," i.e., for the purposes of the Rehabilitation Act, as "the meaning given in section 12102 of Title 42." All events relevant to this case occurred before January 1, 2009. The Court should therefore apply the statute as it existed before the amendments if applying the amended statute would affect substantive rights, liabilities, or duties of a party, unless there exists a clear Congressional intent that the statute be applied retroactively. See Black v. M & W Gear Co., 269 F.3d 1220, 1228 n.3 (10th Cir. 2001) ("The presumption against retroactive application of a statute applies 'absent clear congressional intent favoring' retroactive application of the new statute. . . . And it applies to amended statutes as well as new statutes."); Lytes v. DC Water & Sewer Auth., 572 F.3d 936, 939-40 (D.C. Cir. 2009)(explaining that a court should not apply a statute to conduct occurring before its enactment if to do so would "affect[] substantive rights, liabilities, or duties [on the basis of] conduct arising before [its] enactment.")(quoting Landgraf v. USI Film Prods., 511 U.S. 244, 278 (1994)). Because it would impose substantive liability on the Defendant for conduct arising before the statute's

-19-

. . . defines the term 'disabled' to mean 'a physical or mental impairment that substantially limits one or more major life activities,'")(quoting 29 U.S.C. § 705(9)(B)).  The term "individual with a disability" also includes one who "has a record of such an impairment; or . . . is regarded as having such an impairment."  29 U.S.C. § 705(20)(B).[17]  The impairment therefore must limit a "major life activity," and the limitation must be "substantial."  "A major life activity is a 'basic activity that the average person in the general population can perform with little or no difficulty,'" Rakity v. Dillon Companies, Inc., 302 F.3d 1152, 1158 (10th Cir. 2002)(quoting Pack v. Kmart Corp., 166 F.3d 1300, 1305 (10th Cir. 1999)), and includes "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working," 29 C.F.R. § 1630.2(i); 29 C.F.R. § 1630.2(j)(3), and sleeping, see Pack v. Kmart Corp., 166 F.3d at 1305.[18]  See also

_____

enactment to apply the modified disability standards in this case, see 572 F.3d at 939-40, and because the Court has found no evidence in the statute or legislative history from which it can infer a Congressional intent that courts apply the 2008 amendments retroactively, see Pub. L. No. 110-325, 122 Stat. 3553, 3559 (Sept. 25, 2008)(stating that "[t]his Act and the amendments made by this Act shall become effective on January 1, 2009."), the Court will apply the statute as it existed at the time of the Defendant's alleged unlawful conduct.  Cf. Cox v. Phelps Dodge Corp., 43 F.3d 1345, 1347 (10th Cir. 1994)(dismissing a plaintiff's appeal as moot because "she has no redressable injury under Title VII as that statute existed at the time of the conduct in question.").  Moreover, both parties implicitly assent to this conclusion by citing pre-amendment law, and neither party argues that the Court should apply the new definition in this case.

[17] Congress deleted this language in the 2008 amendment, but effectively the same provision lives on in 42 U.S.C. § 12102(1).  See 42 U.S.C. § 12102(1) ("The term 'disability' means, with respect to an individual . . . (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3)).").  Section 705(20)(B) of Title 29 now directs readers to 42 U.S.C. § 12102 for its definition of "individual with a disability."  29 U.S.C. § 705(20)(B).  Again, the Court applies the statutory language as it existed at the time of the alleged discriminatory conduct.  The parties do not address the "record-of" or "regarded-as" forms of disability.

[18] The amendment to 29 U.S.C. § 705, which took effect January 1, 2009, directed the reader to 42 U.S.C. § 12102 for its definition of disability.  Section 12012 also contains a larger list of "major life activities" which includes "sleeping."  42 U.S.C. § 12102(2)(A)(defining major life

Poindexter v. Atchison, Topeka & Santa Fe Ry. Co., 168 F.3d 1228, 1231-32 (10th Cir. 1999).

"Moreover, in determining how a particular impairment affects a particular plaintiff, the Court must consider any corrective or mitigating measures taken by that individual." Ragusa v. Malverne Union Free Sch. Dist., 582 F. Supp. 2d 326, 341-42 (E.D.N.Y. 2008)(citing Sutton v. United Air Lines, Inc., 527 U.S. 471, 482-84 (1999)).[19]

For a major life activity to be "substantially limited," "an individual must have an impairment that prevents or severely restricts the individual from doing [the] activit[y]." Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 185 (2002).  The regulations implementing the ADA, and presumably incorporated into the Rehabilitation Act, defines "substantially limits" as:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or

> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1).  The same regulation gives three factors to consider in "determining whether an individual is substantially limited in a major life activity": "(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the

---

activities as including, but not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working").

[19] The Honorable Dennis Hurley, Senior United States District Judge for the Eastern District of New York, noted that the 2008 amendments to the ADA superseded this aspect of the Supreme Court's decision in Sutton v. United Air Lines, Inc.  Judge Hurley also noted, however, as the Court has, that those amendments did not to go into effect until January 1, 2009.  See Ragusa v. Malverne Union Free Sch. Dist., 582 F. Supp. 2d at 341 n.4.  For the reasons mentioned above, the Court applies the law as it was when the Defendant engaged in the challenged conduct.

impairment." 29 C.F.R. § 1630.2(j)(2).  See MacDonald v. Delta Air Lines, Inc., 94 F.3d 1437,

1444 (10th Cir. 1996).  A court must also "consider the effects of corrective or mitigating measures

. . . on the impairment." Doyal v. Oklahoma Heart, Inc., 213 F.3d 492, 496 (10th Cir. 2000).

"To demonstrate that an impairment 'substantially limits' the major life activity of working,

an individual must show 'significant[ ] restrict[ion] in the ability to perform either a *class of jobs*

or a *broad range of jobs in various classes* as compared to the average person having comparable

training, skills and abilities.'" Bolton v. Scrivner, Inc., 36 F.3d 939, 942 (10th Cir. 1994)(quoting

29 C.F.R. § 1630.2(j)(3)(i))(emphasis in original).  "The inability to perform a single, particular job

does not constitute a substantial limitation in the major life activity of working." 29 C.F.R.

§ 1630.2(j)(3)(i).  Three additional factors are relevant to the question whether an individual has a

disability substantially limiting the major life activity of working:

> (A) The geographical area to which the individual has reasonable access;
>
> (B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or
>
> (C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 C.F.R. § 1630.2(j)(3)(ii).

## REVIEW OF MSPB DECISIONS

"Federal employees, like employees of private concerns, must exhaust the applicable

administrative remedies before seeking judicial review." Dossa v. Wynne, 529 F.3d 911, 913 (10th

Cir. 2008)(citing Coffman v. Glickman, 328 F.3d at 624).  "A federal employee may exhaust

administrative remedies either by filing a complaint with the [Equal Employment Opportunity] department of the employing agency or by proceeding to the MSPB." Dossa v. Wynne, 529 F.3d at 913. "If the employee chooses to appeal to the MSPB . . . the employee will have a hearing at which he or she must raise his or her claims of discrimination and present evidence in support of those claims in order to exhaust the administrative remedy." Coffman v. Glickman, 328 F.3d at 624.

In reviewing the MSPB's decisions, the standard of review depends on the nature of the claim brought before the MSPB. General claims of wrongful adverse employment action by a federal employer are reviewed solely on the administrative record and can be set aside only where the agency's "action, findings, or conclusions [are] found to be (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence[.]" 5 U.S.C. § 7703(c). Such cases must be filed in the United States Court of Appeals for the Federal Circuit. See Coffman v. Glickman, 328 F.3d at 621 ("Review of a MSPB determination which does not involve claims of unlawful discrimination is conducted by the United States Court of Appeals for the Federal Circuit."); Williams v. Rice, 983 F.2d 177, 179-80 (10th Cir. 1993)("Normally, pursuant to 5 U.S.C. § 7703(b)(1), the Federal Circuit has exclusive jurisdiction over appeals from the MSPB[.]")(citing 5 U.S.C. § 7703(b)(2)). Under this arbitrary-and-capricious standard of review, "[t]he reviewing court 'may not substitute its judgment for that of the MSPB.'" Williams v. Rice, 983 F.2d at 180 (quoting Wilder v. Prokop, 846 F.2d 613, 619 (10th Cir. 1988)). "Under the arbitrary and capricious standard the MSPB's decision needs only to have a rational basis in law." Wilder v. Prokop, 846 F.2d 613, 619 (10th Cir. 1988).

Where the plaintiff complains of an adverse employment action that includes an allegation of unlawful discrimination, however, the appeal may be brought in the federal district court having

proper venue and jurisdiction over the parties.  See Coffman v. Glickman, 328 F.3d at 621-22 ("[W]hen an appeal to the MSPB involves claims of unlawful discrimination related to or stemming from the employment action, it is considered a 'mixed' appeal.  Review of MSPB determinations in "mixed" cases lies solely in a district court."); Williams v. Rice, 983 F.2d at 179-80 ("[T]he Federal Circuit has exclusive jurisdiction over appeals from the MSPB, except where, as here, the appellant's claim includes an allegation of discrimination."); Wall v. United States, 871 F.2d 1540, 1542 (10th Cir. 1989)("[C]ases of alleged discrimination 'subject to the provisions of section 7702' shall be filed under the applicable statute in a United States District Court."); 5 U.S.C § 7703(b)(1), (2) (placing exclusive jurisdiction of MSPB appeals in the Federal Circuit, except "[c]ases of discrimination subject to the provisions of section 7702 of this title").[20]  Even when the plaintiff alleges multiple bases for his MSPB action, only one of which is a discrimination-based wrongful employment action -- so-called "mixed cases" -- the appeal of the MSPB action may be to any otherwise-proper federal district court.  See Coffman v. Glickman, 328 F.3d at 621-22; Williams v. Rice, 983 F.2d at 179-80; Wall v. United States, 871 F.2d at 1542.  The MSPB's decisions with respect to those discrimination-based claims, unlike all other claims, are reviewed by trial de novo.  See Coffman v. Glickman, 328 F.3d at 622; Williams v. Rice, 983 F.2d at 179 ("On the discrimination claim, the petitioner 'shall have the right to trial de novo by the reviewing

---

[20] The Tenth Circuit in Wall v. United States stated:

Discrimination cases "subject to the provisions of section 7702" include cases where an employee or an applicant for employment (1) has been affected by an action of an agency which may be appealed to the Board and (2) alleges that the basis for the agency's action was discrimination prohibited by, inter alia, the Rehabilitation Act of 1973 and the Age Discrimination in Employment Act of 1967.

Wall v. United States, 871 F.2d at 1542.

court.'")(quoting 5 U.S.C. § 7703(c)).  Non-discrimination-based claims in these mixed cases are still reviewed under the arbitrary-and-capricious standard of 5 U.S.C. § 7703(c).  See Valles v. Donley, 292 Fed. Appx. 711, 714 (10th Cir. 2008); Williams v. Rice, 983 F.2d at 180.

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure states that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case."  Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(internal quotation marks omitted).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant meets this burden, rule 56(e) requires the non-moving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.")(internal quotes omitted).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  Rule 56 provides that "an opposing party may not rely merely on allegations or denials in its own pleadings; rather, its response must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  It is not enough

-25-

for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his [or her] pleadings." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'"). Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(citing Fed. R. Civ. P. 56(e) and Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539. Rather, there must be sufficient evidence on which the fact-finder could reasonably find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improv. Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539. "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty

Lobby, Inc., 477 U.S. at 249 (internal citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the non-moving party, there is no genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind three principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999).  Third, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

## ANALYSIS

The Defendant argues that DeSantis has failed to create a genuine issue of material fact whether he is an individual with a disability for the purposes of the Rehabilitation Act.  See Motion at 13-20.  DeSantis responds that he is a qualified person with a disability, and that the major life activities that he contends his disability substantially impairs are sleeping and working.  See Response at 9.  Upon reviewing the parties' arguments and the relevant authorities, the Court agrees that DeSantis has not demonstrated a factual issue whether he is disabled under the Rehabilitation Act because he is substantially limited in the major life activities of sleeping or working.  Moreover, the Court concludes that DeSantis never put the Defendant on notice of his desire for a transfer as an accommodation for his PTSD, and thus for that reason as well, the Court rejects his failure-to-accommodate argument.  The Court thus grants the Defendant's motion for summary judgment, rejects the discrimination-based arguments in DeSantis' appeal from the MSPB, and dismisses DeSantis' Complaint.

I.      **DESANTIS HAS FAILED TO SHOW A GENUINE ISSUE OF MATERIAL FACT WHETHER HE IS DISABLED.**

DeSantis alleges that he is a qualified person with a disability for the purposes of the Rehabilitation Act.  This allegation is essential to any Rehabilitation-Act-based claim or defense he may assert.  This claim, however, fails.

First, DeSantis attempts to argue that, because "PTSD is a recognized disability under the Americans with Disability Act and the Rehabilitation Act" -- a fact for which he cites only to an informational brochure that the National Institutes of Health apparently published -- DeSantis is disabled for the purposes of the Rehabilitation Act.  Response at 15.  This argument ignores that there is a substantial body of law setting forth the standard for determining when and if a plaintiff is disabled under the Rehabilitation Act.  Moreover, even if some case law had determined that some individuals with PTSD are disabled, such holding would not apply to all cases.  "An inquiry into whether a plaintiff is substantially limited in a major life activity requires an individualized analysis because an impairment that is disabling for some may not be disabling for others."  Doyal v. Oklahoma Heart, Inc., 213 F.3d at 496.  DeSantis' apparent argument is also at odds with his statements later in his response brief, that "merely having an impairment does not make an individual disabled for the purposes of the Rehabilitation Act."  Response at 19 (citing Toyota Motors Mfg., Ky., Inc. v. Williams, 534 U.S. at 195).  The Court will decline to find that DeSantis is disabled solely because he has been diagnosed with PTSD.

A person has a disability for the purpose of the Rehabilitation Act if he or she has "a physical or mental impairment that substantially limits one or more major life activities."  29 U.S.C.

§ 705(9)(B).[21]  The impairment must limit at least one "major life activity," and that limitation must

be "substantial."  DeSantis asserts that he suffers from a particular mental impairment -- PTSD[22] --

which substantially limits two major life activities: (i) sleeping and (ii) working.[23]  Both working

and sleeping are major life activities the substantial impairment of which would constitute a

disability under the Rehabilitation Act.  See Poindexter v. Atchison, Topeka & Santa Fe Ry. Co.,

168 F.3d at 1231-32 (working); Pack v. Kmart Corp., 166 F.3d at 1305 (sleeping); 29 C.F.R.

§ 1630.2(i).  To be "substantially limited" in performance of a major life activity, "an individual

must have an impairment that prevent or severely restricts the individual from doing [the]

activit[y]."  Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. at 185.  Obviously, the inability to

perform the activity at all would constitute substantial limitation.  Otherwise, substantial limitation

is defined as "[s]ignificantly restricted as to the condition, manner, or duration under which an

individual can perform a particular major life activity as compared to the condition, manner, or

---

[21]Again, the Court refers to the version of 29 U.S.C. § 705 that was in effect at the time of the alleged discrimination, rather than the amended version which took effect on January 1, 2009.  See Ragusa v. Malverne Union Free Sch. Dist., 582 F. Supp. 2d at 341 n.4.

[22] DeSantis attempts to assert two mental impairments -- PTSD and attachment/separation disorder based on his wife being stationed in Utah while he remained in New Mexico.  See Response at 11.  The Defendant has provided an interrogatory response and a snippet of DeSantis' deposition testimony in which DeSantis asserts that his claim is based only on his PTSD, effectively limiting him to pursuit of claims based on his alleged PTSD.  See Response Exhibit Q (response to interrogatory); DeSantis Depo. at 320:3-8 (Q: [A]nd the only disability you are claiming is PTSD, correct?  A: correct.").  The Court does not resolve whether DeSantis' separation disorder is at issue in this case, because regardless whether the Court considers DeSantis' separation disorder as a separate impairment, the Court concludes that DeSantis' impairments do not substantially limit DeSantis in the major life activities of working or sleeping.

[23] The Court analyzes only whether DeSantis is substantially limited in the major life activities of working or sleeping because, "in making determinations of law [a deciding court] is to analyze only the major life activity asserted by the plaintiff."  Doyal v. Oklahoma Heart, Inc., 213 F.3d at 496 (quoting Poindexter v. Achison, Topeka & Santa Fe Ry. Co., 168 F.3d at 1231-32).

duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(ii).

### A.   DESANTIS HAS FAILED TO DEMONSTRATE A GENUINE ISSUE OF MATERIAL FACT WHETHER HIS PTSD SUBSTANTIALLY LIMITS HIS ABILITY TO SLEEP.

In the United States Court of Appeals for the Tenth Circuit, establishing a disability through a psychological impairment that substantially limits one's ability to perform the major life activity of sleep is rather onerous.  In Doyal v. Oklahoma Heart, Inc., the Tenth Circuit demonstrated this fact.  Carol Doyal was an employee of Oklahoma Heart, a cardiology practice group.  See 213 F.3d at 494.  Oklahoma Heart steadily grew over time, and Doyal's responsibilities likewise grew, until she began experiencing "significant feelings of helplessness, anxiety, excessive stress and lack of motivation," among other symptoms.  Id.  One of those symptoms was insomnia to the point of sleeping only one to three hours per night.  See id. at 494-95.  Oklahoma Heart fired Doyal, citing as its reasoning her "inability to make decisions and her lapses of memory, judgment, and confidentiality."  Id. at 495.  Doyal brought a claim of disability discrimination under the ADA, which shares its definition of disability with the Rehabilitation Act.

Oklahoma Heart moved for summary judgment, just as the Defendant has in this case, and the district court granted the motion.  See 213 F.3d at 495.  The Tenth Circuit affirmed the district court's grant of summary judgment, notwithstanding testimony that Doyal had insomnia and sometimes slept only one to three hours each night.  In doing so, the Tenth Circuit noted passages from a sworn declaration that Doyal filed, in which she said: "I began taking medication to help me sleep.  Sometimes the medication would help and sometimes it didn't."  Id. at 497.  Her declaration also stated that, in response to taking the sleep medication, she would sometimes take too much and sleep up to fourteen hours in a night.  See id.  The Tenth Circuit concluded:

[T]he evidence here showed that Doyal suffered at times from insomnia. As was true in <u>Pack [v. Kmart Corp.</u>,] the evidence showed that Doyal's problems were mitigated, though not cured, by medication. Moreover, the evidence here showed that, by the time of Doyal's discharge, she was sleeping as much as fourteen hours a night. While excessive sleepiness may pose another problem, the fact that Doyal was sleeping for such long periods precludes an inference that her insomnia was severe, permanent, and untreatable enough to support a reasonable conclusion that she was significantly restricted in her ability to sleep.

213 F.3d at 498.

In <u>Pack v. Kmart Corp.</u>, the Tenth Circuit decided a case similar to <u>Doyal v. Oklahoma</u>

<u>Heart, Inc.</u> -- and, therefore, similar to this case. In <u>Pack v. Kmart Corp.</u>, Teresita Pack presented

the following evidence, as the Tenth Circuit recounted it:

At trial, Pack testified that in January, 1995, "[s]ometimes I would go off into -- finally go to sleep and I would wake up shaking, crying, nervous, upset. I would be up for two or three hours before I could go back to sleep again. Sometimes I wouldn't get but maybe two, three hours at the most sleep all night long. [sic] I would toss and turn all night long." The only other evidence of Pack's ability or inability to sleep is found in Dr. Koduri's medical notes. On July 8, 1994, in her initial consultation with Dr. Koduri, Pack complained of "decreased sleep with increased latency, moving frequently in her sleep, [and] not feeling fresh when waking up in the morning, . . . ." On July 11, 1994, Dr. Koduri noted that Pack was "[s]till having significant problem with sleep, up until 2 or 3 in the morning." On July 22, 1994, Dr. Koduri noted Pack "says that she was feeling extremely drowsy, sleepy all the time." On July 29, 1994, Dr. Koduri noted Pack "doesn't feel as drowsy as she used to, her sleep is getting better, and even her husband has commented on her improvement." On August 17, 1994, Dr. Koduri cut back Pack's evening medication because it "makes her too sleepy." There are no further notations regarding sleep until November 21, 1994, when Dr. Koduri noted Pack had been having erratic sleep patterns and discussed with her the need for a structured sleep pattern. Finally, on December 5, 1994, Dr. Koduri noted Pack's "sleep is improving a little bit."

<u>Pack v. Kmart Corp.</u>, 166 F.3d at 1306 (internal citations omitted). The Tenth Circuit found this

evidence was insufficient to establish that Pack's impairment substantially limited her ability to

sleep.

While the evidence showed Pack had episodes of sleep disruption and/or waking without feeling rested during 1994 and January 1995, there is no indication that her

-31-

sleep problems were severe, long term, or had a permanent impact.  Pack failed to satisfy her burden to present evidence of her impairment and the extent to which the impairment limited her major life activity of sleeping.

Pack v. Kmart Corp., 166 F.3d at 1306.

DeSantis concedes that "[i]t is the Plaintiff's burden to prove the duration and extent of his condition."  Response at 14 (citing 5 C.F.R. § 1201.56(a)(2)(iii) and Mahaffey v. Dep't of Agriculture, 105 M.S.P.R. 347, 356 (2007)).  See Corley v. Dep't of Veterans Affairs, 218 Fed. Appx. at 725 ("It was [the plaintiff's] burden to establish the frequency of his impairment.").  While DeSantis acknowledges that the burden is his, he does not carry it.  The Defendant argues that DeSantis offers nothing more than the testimony of his counselor, Grenko, to establish that his "sleep problems were severe, long term, or had permanent impact."  Reply at 14 (quoting Doyal v. Oklahoma Heart, Inc., 213 F.3d at 498).[24]  The Court has reviewed Grenko's testimony and the other summary-judgment evidence that DeSantis provides and finds that it fails to establish that DeSantis was substantially limited in his ability to sleep.

Having reviewed all of the evidence that both parties cited, the Court finds very little

_____

[24] It is at least arguable that DeSantis' statements about his sleeping problems, if proffered by Grenko rather than by DeSantis, are admissible under a hearsay exception.  If DeSantis expressed to Grenko his constant difficulty concentrating due to a lack of sleep, that hearsay statement might be admissible under rule 803(1) as a statement "describing or explaining [a] condition made while the declarant was perceiving the . . . condition," or under rule 803(2) as a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition."  Fed. R. Evid. 803(1) and 803(2).  Because psychology is a form of medicine for the purposes of the hearsay exceptions, see United States v. Farley, 992 F.2d 1122, 1125 (10th Cir. 1993)(holding that hearsay testimony regarding child victim's statements to a psychologist "would be admissible under Fed. R. Evid. 803(4)"); United States v. Newman, 965 F.2d 206, 210 (7th Cir. 1992)("Is psychology medicine?  For purposes of [rule 803], it is."), and because Grenko was DeSantis' therapist for a period of time, Grenko's reiterations of DeSantis' descriptions of his sleeping problems might be admissible under rule 803(4) as "[s]tatements made for purposes of medical diagnosis or treatment and describing . . . past or present symptoms . . . insofar as reasonably pertinent to diagnosis or treatment," Fed. R. Evid. 803(4).  The Court will therefore consider these statements in ruling on this motion for summary judgment.

evidence of any sort relating to DeSantis' inability to sleep.  None of Grenko's testimony details the frequency or severity of DeSantis' sleeping problems.  <u>See</u> AR 1942:8-1992:6 (Grenko).  The most probative items of evidence regarding DeSantis lack of sleep are two.  The first is his "Traumatic Injury and Claim for Continuation of Pay/Compensation" form, which DeSantis filled out in 2005, citing loss of sleep as a symptom for which he sought counseling.  Reply Exhibit N.  The second is another such form that DeSantis filled out on April 10, 2007 -- immediately after being told that his transfer to Utah was approved and then having that approval rescinded -- which also states that he had recently begun experiencing insomnia again.  <u>See</u> AR 1597-1600.  Even those, however, fail to indicate the frequency or severity of DeSantis' sleeping problems, and, without such evidence, DeSantis cannot show a genuine issue of material fact that the impairment substantially limited his ability to sleep.

Moreover, DeSantis' evidence indicates that DeSantis was, at most times, able to control the symptoms of his PTSD, including his insomnia.  An April 27, 2007 letter, which Deetz and Hernandez sent to Nunez, stated that "[DeSantis] reported a renewed ability to cope with the demands that were placed on him by his employment[,]" and that it was only on April 20, 2007 that "DeSantis . . . stat[ed] that his work situation had now become unbearable."  AR 1601.  It was apparently on or about April 20, 2007 that DeSantis began experiencing -- or experiencing again -- the more severe symptoms of PTSD, such as insomnia.  <u>See id.</u>  At that point, Deetz and Hernandez started DeSantis on medication that had the potential to cure those symptoms.  There is no evidence whether the symptoms continued past that time.  An April 14, 2007 evaluation of DeSantis by Grenko reported that, during his first eight months of therapy with Grenko, DeSantis "was able to manage most of the symptoms of his PTSD."  AR 1602 (April 14, 2007 Diagnostic Summary and Status by Anthony Grenko).  In December of 2006, DeSantis had another resurgence of PTSD

symptoms, but was given medication to control the symptoms.  See id.  The evaluation then implies

that DeSantis' symptoms were dormant until April of 2007 when DeSantis was told that he would

be transferred to Utah, and then told that he would not be so transferred.  See id. at 1602-1603.  At

that time, according to Grenko's evaluation, "[DeSantis'] previous PTSD symptoms returned in

force."  AR 1603.  Both reports indicate that medication was administered to combat this resurgence

of symptoms, but the reports give no indication whether the medication was successful.  At best, the

evidence demonstrates that DeSantis periodically suffered from insomnia, but that he is responsive

to treatment.

     "[I]f a person is taking measures to correct for, or mitigate, a physical or mental impairment,

the effects of those measures -- both positive and negative -- must be taken into account when

judging whether that person is 'substantially limited' in a major life activity and thus 'disabled'

under the Act."  Sutton v. United Air Lines, Inc., 527 U.S. at 482.[25]  The evidence shows only that

DeSantis had sleeping problems periodically, and that his therapists prescribed medication to control

the symptoms.  A May 10, 2006 letter by Sachs indicated that, after DeSantis' counseling sessions

with Sachs, DeSantis appeared to have "worked through his traumatic stress quite successfully and

no other problems were present . . . ."  Letter from David Sachs to Whom It May Concern (dated

May 10, 2006).  Even DeSantis' somber April 10, 2007 application for paid time off described the

--------

     [25] Again, the Court recognizes that the ADA Amendments Act of 2008 was intended to
overturn this decision of the Supreme Court, see Sulima v. Tobyhanna Army Depot, 602 F.3d 177,
186 n.3 (3d Cir. 2010); however, those amendments were to take effect January 1, 2009, after all
events underlying this lawsuit had already taken place.  See Lytes v. DC Water & Sewer Auth., 572
F.3d 936 (D.C. Cir. 2009)("On September 25, 2008 the Congress enacted the ADA Amendments
Act of 2008 (ADAA) in order to 'reinstat[e] a broad scope of protection' under the ADA and to
'reject' the holdings in Toyota Motor Mfg., Ky. v. Williams, 534 U.S. 184 . . . (2002), and Sutton
v. United Air Lines, 527 U.S. 471 . . . (1999) [but] Congress delayed the effective date of the ADAA
to January 1, 2009.").

remarkable success of his treatment until his lapse on April 2, 2007.  See AR 1599.  The totality of

the evidence indicates that, generally, DeSantis was able to control his symptoms, although he had

periodic flare-ups, one of which occurred in April of 2007, immediately before the letter, report, and

application for leave.  The letter and report, however, inform the Court that further medication was

administered to battle the resurgence of DeSantis' symptoms.  So far as the Court is aware, that

medication was successful -- as it had been in the past -- in treating DeSantis' symptoms.  DeSantis

does not provide the Court with deposition testimony or citation to the administrative record wherein

DeSantis states that he still cannot sleep and that his medication does not relieve this symptom.[26]

DeSantis therefore does not carry his burden to establish the frequency of the impairment, nor does

he provide evidence that the medication prescribed by his physicians failed to remedy this symptom.

Under the standard set forth in Pack v. Kmart Corp. and Doyal v. Oklahoma Heart, Inc., DeSantis

failed to create a genuine issue of material fact as to the "substantial limitation" of his ability to

sleep, as required by 29 U.S.C. § 705(9)(B).

### B. DESANTIS HAS FAILED TO SHOW A GENUINE FACTUAL ISSUE WHETHER HIS PTSD SUBSTANTIALLY LIMITS HIS ABILITY TO WORK.

The second major life activity that DeSantis alleges has been substantially limited by the

mental impairment of PTSD is his ability to work.  Limitations on major life activity of working are

subject to a different standard than most other substantial limitations.  "[T]o demonstrate that an

impairment 'substantially limits' the major life activity of working, an individual must show

'significant[] restrict[ion] in the ability to perform either a *class of jobs* or a *broad range of jobs in*

---

[26] In fact, in his brief, DeSantis cites only to the letters informing him that he was awarded OPM and SSA disability retirement income when arguing that he is a "qualified individual with a disability."  Response at 20.  For reasons the Court will explain more fully below, the Court will not consider those letters as evidence of DeSantis' disability in this case.

*various classes* as compared to the average person having comparable training, skills and abilities."

Bolton v. Scrivner, Inc., 36 F.3d at 942 (quoting 29 C.F.R. § 1630.2(j)(3)(i))(emphasis in original).

On the other hand, "[t]he inability to perform a single, particular job does not constitute a substantial

limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i). See Murphy v. United

Parcel Serv., Inc., 527 U.S. 516, 523 (1999)("[T]o be regarded as substantially limited in the major

life activity of working, one must be regarded as precluded from more than a particular job.").

Once again, DeSantis' brief does not substantially aid the Court in this analysis. DeSantis

appears to allege only that he is unable, because of his PTSD, to perform the duties of an ICE agent

on the United States-Mexico border. His arguments that a reasonable accommodation for his

disability would have been to transfer him to a facility in Salt Lake City underscores that he alleges

that he could perform his duties if they were in a different location. Broadly construed, DeSantis

might be alleging that he is unable, because of his impairment, to perform any job that includes

examination or recovery of dead bodies.[27] The Court does not believe that "jobs that involve

investigating dead bodies" is a class of jobs as the drafters of 29 C.F.R. § 1630.2(j)(3)(i) intended,

and likewise does not believe that "jobs that involve dead bodies" is a broad range of jobs in various

classes. See Murphy v. United Parcel Serv., Inc., 527 U.S. at 524-25 ("The evidence that petitioner

is regarded as unable to meet the DOT regulations is not sufficient to create a genuine issue of

material fact as to whether petitioner is regarded as unable to perform a class of jobs utilizing his

skills."); Sutton v. United Air Lines, Inc., 527 U.S. at 492 ("To be substantially limited in the major

---

[27] Although Grenko refused to be pinned down on the fact on cross-examination, see AR 1975:4-22 (Grenko), his testimony at the administrative hearing indicated that the set of jobs DeSantis would be unable to perform was in fact even smaller -- jobs that involve investigating the bodies of people who died from exposure to the elements, see AR 1951:7-16 (Grenko); id. at 1959:24-1956:1 (Grenko); id. at 1962:3-11 (Grenko); id. at 1962:24-1965:20 (Grenko); id. at 1978:21-24 (Grenko); id. at 1988:5-13 (Grenko); id. at 1990:18-1991:4 (Grenko).

life activity of working, . . . one must be precluded from more than one type of job, a specialized job, or a particular job of choice."); Detterline v. Salazar, 320 Fed. Appx. 853, 857 (10th Cir. 2009)("A 'class' of jobs is a set of jobs 'utilizing similar training, knowledge, skills or abilities,' while a 'broad range of jobs' refers to a number of dissimilar jobs which a plaintiff is unable to perform.")(quoting EEOC v. Heartway Corp., 466 F.3d 1156, 1164 (10th Cir. 2006)).  Moreover, in the Tenth Circuit, it is DeSantis' burden to show that the collection of jobs from which his impairment excludes him are a "class of jobs" under the Rehabilitation Act.  See Dillon v. Mountain Coal Co., 569 F.3d 1215, 1220 (10th Cir. 2009)("Mr. Dillon did not put on other evidence describing the jobs available in the area that fell into the class of 'mining jobs,' nor did he produce evidence demonstrating that mining jobs are, in fact, a class of jobs.).  It is also DeSantis' burden to show that his impairment restricts his ability to engage in a broad range of jobs.  See id. ("[T]here was no evidence that . . . the jobs within the mine [which the plaintiff could not perform] could properly be characterized as a 'class of jobs' or a 'broad range of jobs.'").  DeSantis has not sought to prove that his impairment keeps him from performing a broad range of jobs or that the jobs from which he is now excluded constitutes a class.[28]  DeSantis has not provided the Court with vocational

---

[28] The Court notes that DeSantis' failure to provide evidence addressing his "vocational training, the geographic area to which he has access, or the number and type of jobs demanding similar training from which [he] would also be disqualified," could, without more, be fatal to DeSantis' claim of disability based on substantial limitation to his ability to work.  In Zwygart v. Bd. of County Comm'rs of Jefferson County, Kan., 483 F.3d 1086 (10th Cir. 2007), the Tenth Circuit stated:

> In at least three cases, we have affirmed a district court's dismissal of an employee's ADA claim because the employee failed to provide a single document or record helpful in addressing his vocational training, the geographical area to which he has access, or the number and type of jobs demanding similar training from which he would also be disqualified.

483 F.3d at 1092 (internal quotation marks and alterations omitted)(citing Rakity v. Dillon

reports that are routinely seen in these cases.

The factors in 29 C.F.R. § 1630.2(j)(3)(ii) counsel for finding that DeSantis is not substantially limited in the life activity of working.  Those factors are:

> (A) The geographical area to which the individual has reasonable access;

> (B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or

> (C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 C.F.R. § 1630.2(j)(3)(ii).  DeSantis appears to have reasonable access to a relatively large geographical area; he was willing to take jobs anywhere near Salt Lake City, see Response at 21, and he legitimately has access to the remainder of the United States if he seriously desired a job, see 29 C.F.R. § 1630.2(j)(3)(ii)(A).[29]  Given the scope of DeSantis' alleged impairment -- PTSD triggered by exposure to dead bodies -- DeSantis is likely also unable to perform some other law-enforcement jobs.  See 29 C.F.R. § 1630.2(j)(3)(ii)(A).  Many law-enforcement jobs on the New Mexico/Mexico border would have a similar likelihood of exposing DeSantis to dead bodies.  On

_____

Companies, Inc., 302 F.3d at 1162, Bolton v. Scrivner, Inc., 36 F.3d at 944, and Selenke v. Med. Imaging of Colo., 248 F.3d 1249, 1257 (10th Cir. 2001)).  The Court will nevertheless attempt to discern whether DeSantis demonstrated a genuine issue of material fact whether he is substantially limited in the major life activity of working.

[29] While DeSantis might not have been able to convince ICE to give him a position in Salt Lake City, that does not mean that DeSantis would not be able to work for ICE in Salt Lake City if given that position.  ICE's unwillingness to transfer DeSantis also does not mean that his impairment limits his ability to do other law-enforcement work in the Sale Lake City area -- or any other area in the United States.  As the Court understands this factor, it is concerned with the geographic areas in which DeSantis might feasibly find gainful employment.

the other hand, many non-investigative positions -- i.e., desk jobs -- would not come with such a

risk.  The likelihood of exposure to dead bodies would also decrease as DeSantis moves further from

the border, as most of the deaths with which ICE and BP deal are of illegal aliens crossing the border

and dying from exposure in the desert.  See AR 2426:9-2427:4 (Skelton).  It is therefore unlikely

that he would be disqualified from law-enforcement jobs further from the Mexico border, and such

jobs would use similar training, knowledge, skills or abilities.  See 29 C.F.R. § 1630.2(j)(3)(ii)(B).

He could also seek employment as a law-enforcement trainer or criminal-justice professor using the

training, knowledge, skills and abilities that he used as an ICE agent.  See 29 C.F.R.

§ 1630.2(j)(3)(ii)(B).  Moreover, DeSantis has two higher education degrees, as well as substantial

experience with paperwork and bureaucracy, indicating that he could qualify for any number of jobs

using different skill-sets.  See 29 C.F.R. § 1630.2(j)(3)(iii)(C).  Because DeSantis fails to provide

any evidence that he is disqualified from any jobs except those that include a likelihood of exposing

DeSantis to dead bodies, the Court concludes that DeSantis has failed to create a genuine issue of

material fact whether he suffers from an impairment that substantially limits him in the major life

activity of working.[30]

## C. DESANTIS' RECEIPT OF DISABILITY INCOME DOES NOT CHANGE THE COURT'S ANALYSIS, AND THE COURT WOULD NOT ADMIT SUCH AWARDS AS EVIDENCE.

DeSantis raised in his appeal what he refers to as "New Evidence Not Previously Available."

See Appeal of the Final Decision (Order) of the Merit Systems Protection Board, filed January 20,

2010 (Doc. 36)("Appeal").  In its May 20, 2010 Memorandum Opinion and Order, the Court

---

[30] Again, the only citation to any evidence in this portion of DeSantis' brief is to the letters awarding him OPM and SSA disability retirement income.  For the reasons discussed below, the Court will not consider them to constitute sufficient admissible evidence to demonstrate a genuine issue of material fact whether DeSantis is substantially limited in the major life activity of working.

reserved ruling on the issue in that appeal as it had to do only with DeSantis' claim of employment discrimination based on disability, as to which he was entitled to a trial *de novo* on the facts asserted. In the appeal, DeSantis asserted that, "[o]n May 4, 2008, (more than three weeks after the hearing record had closed) the Social Security Administration determined that the appellant was entitled to a monthly disability benefit based on a finding that he was disabled on April 1, 2007." Appeal at 19. In his Response, DeSantis reiterates this fact, pointing out that both the Office of Personnel Management ("OPM") and the Social Security Administration ("SSA") "have made clear in 2008 that the Plaintiff's disability was based on severe and likely permanent disability." Response at 1. These letters are the only evidence of disability to which DeSantis cites in the portion of his brief discussing the "substantially limits a major life's activities [sic]." Response at 19-22. The Court now addresses that evidence.

### 1. The OPM and SSA Use Different Standards than the ADA and the Rehabilitation Act.

The Court rejects this evidence as sufficient to show a genuine issue of material fact whether DeSantis is disabled under the Rehabilitation Act. The standard for determining disability under the Rehabilitation Act and the ADA is different from that for determining disability for the purpose of the OPM or the SSA. The OPM allows a federal employee to be awarded Federal Employees Retirement System ("FERS") disability when the employee becomes unable, because of disease or injury, to perform "useful and efficient service in [his or her] current position," or in another position within the same agency and commuting area. See OPM.gov, FERS Disability, http://www.opm.gov/retire/pre/fers/disability.asp#Eligibility (last visited May 18, 2010). Disability under the Rehabilitation Act, on the other hand, is concerned with the plaintiff's ability -- or others' perception of the plaintiff's ability -- to perform major life activities. While one major life activity

under the Rehabilitation Act is "working," see 29 C.F.R. § 1630.2(j)(3), the ability to work is not substantially limited unless the plaintiff is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person," 29 C.F.R. § 1630.2(j)(3)(i).  See Bolton v. Scrivner, Inc., 36 F.3d at 942.  The OPM is interested in an employee's ability to usefully and efficiently perform the services or his or her current position, or other positions in the same agency and commuting area.  DeSantis alleges that he cannot perform the duties of an ICE agent on the Southwest border -- an allegation that would constitute disability under the OPM's guidelines, but does not qualify as a disability under the Rehabilitation Act.[31]

The SSA's disability standard is also distinct from the standard for establishing disability under the Rehabilitation Act.  See Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 801-05 (1999).  The SSA has a five-step process for determining whether an applicant is entitled to disability retirement income.  See 20 C.F.R. § 404.1520(a)(4).  Rather than making a case-by-case assessment of the severity of an impairment and its effect on a specific major life activity, as the Rehabilitation Act demands, see Doyal v. Oklahoma Heart, Inc., 213 F.3d at 496, the SSA has an appendix of impairments and if the applicant's impairment is considered to be equivalent to one of the impairments on that list, the SSA finds that the applicant is disabled, see 20 C.F.R. § 404.1520(a)(4).  The five-step process states:

> If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not go on to the next step. . . . (iii) . . . If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

---

[31] The letter from Shara Wells to DeSantis, dated March 3, 2008, on page 4 of Exhibit 1 underscores the limited nature of the OPM disability finding.  It states: "Our records show that you claim you were disabled due to multiple medical conditions.  However, in reviewing your medical records we have found you to be disabled for your position as a criminal investigator, due to PTSD **only**."  Response Exhibit 1, at 4 (bold in original).

20 C.F.R. § § 404.1520(a)(4).  The Supreme Court has acknowledged that, because the Social Security system has been streamlined, it was "inevitably simplif[ied], eliminating consideration of many differences potentially relevant to an individual's ability to perform a particular job." Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. at 804.  "Hence, an individual might qualify for [Social Security/Disability Income] under the SSA's administrative rules and yet, due to special individual circumstances, remain capable of 'perform[ing] the essential functions' of [his or] her job." Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. at 804.

Moreover, the Court has no way of knowing in which, if any, major life activity the SSA determined DeSantis is substantially limited.  The letter that DeSantis received which informed him that he was to receive Social Security/Disability benefits is devoid of any details as to the disability that the SSA found.  See Response Exhibit 2.  The personalized information in the letter is limited to the first paragraph, which specifies that the SSA found DeSantis was disabled under the Social Security Act as of April 1, 2007, making him eligible for disability payments starting September of 2007.  See id.  Finally, although the letter from the SSA indicates that DeSantis was disabled as of April 1, 2007, the letter was not sent until May 4, 2008 -- after DeSantis was removed from his position at ICE.  Without some indication on what evidence the SSA evaluators based their conclusion that DeSantis' disability began in April 2007, especially considering that those evaluators were applying a different standard, the Court does not believe the letters are sufficient evidence -- alone or with the other evidence in the record -- that, on April 1, 2007, DeSantis was disabled under the Rehabilitation Act.  The Court thus concludes that there is no genuine issue of material fact whether DeSantis was substantially limited in his ability to sleep or work at any time before his dismissal from service on August 15, 2007.

## 2.     The Court Would Not Admit the SSA and OPM Disability Award Letters at Trial, and Therefore Will Not Consider Them On Summary Judgment.

In addition to finding that the SSA and OPM disability award letters are not probative of the issue of disability under the Rehabilitation Act, the Court will not consider them for another reason: they would be inadmissible at trial.  See Rocky Mountain Rogues, Inc. v. Town of Alpine, No. 08-8087, 2010 WL 1531156, at *3 (10th Cir. Apr. 19, 2010)("Moreover, we may consider only admissible evidence when ruling on a motion for summary judgment."); World of Sleep, Inc. v. La-Z-Boy Chair, Co., 756 F.2d 1467, 1474 (10th Cir. 1985)("[T]he court may consider only admissible evidence in ruling on a motion for summary judgment.");  Guidance Endodontics, LLC v. Dentsply Int'l, Inc., No. CIV 08-1101 JB/RLP, 2010 WL 1608949, at *11 (D.N.M. Mar. 23, 2010)(Browning, J.)("A party can satisfy this standard as to claims or elements for which the non-movant bears the burden of proof at trial by pointing out that the non-movant has no *admissible* evidence as to those claims or defenses.")(emphasis added)(citing Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 671 (10th Cir. 1998)).  The Court would exclude the OPM and SSA letters under rule 403 of the Federal Rules of Evidence because their probative value is substantially outweighed by the danger of unfair prejudice and confusion of the issues.  Because summary-judgment evidence must be admissible, the Court will disregard these inadmissible documents when deciding whether DeSantis has demonstrated a genuine issue of material fact.

The Court has previously held that letters, determinations, and decisions of other federal agencies -- specifically, the Human Rights Division, the Equal Employment Opportunity Commission, and Department of Justice -- were inadmissible because they lacked adequate indicia of reliability.  In Ram v. New Mexico Department of Environment, No. CIV 05-1083 JB/WPL, 2006 WL 4079622 (D.N.M. Dec. 11, 2006)(Browning, J.), another employment-discrimination case, the

Court was faced with a motion in limine by which the defendant sought to prohibit the plaintiff from admitting letters, determinations, and decisions from these federal agencies at trial.  See id., at *1. The Court concluded:

> [T]he circumstances surrounding these administrative materials do not bear adequate indicia of trustworthiness to justify their admission in light of their limited probative value on the ultimate issues at trial in this case.  They are not the product of hearings or of formal procedures aimed at developing a factual record and giving the parties the opportunity to respond to argument and to cross-examine witnesses.  Rather, "the matter and things contained therein express merely the opinion of one whose official office and duty does not rise to the dignity of an adjudicator of causes and effects." Franklin v. Skelly Oil Co., 141 F.2d [568,] 572 [(1944)](excluding a report documenting a fire inspector's opinion regarding the cause of a fire because the report consisted only of the inspector's opinion and were not the product of an adjudicatory proceeding).  Consistent with the criteria suggested in the advisory committee's note to rule 803(8)(C), and the Tenth Circuit's endorsement of that criteria in Denny v. Hutchison Sales Corp., those opinions are not sufficient grounds for admission of this evidence.  See Denny v. Hutchison Sales Corp., 649 F.2d [816,] 821-22 [(1981)](affirming trial court's exclusion of Colorado Civil Rights Commission findings because the findings were the result of an ex parte investigation which did not involve formal procedures or afford the parties opportunity for cross-examination).

Id., at *3.  See Denny v. Hutchinson Sales Corp., 649 F.2d at 821 ("Rule 803(8)(C) allows the court to exclude the reports if 'the sources of information or other circumstances indicate lack of trustworthiness.'").  As in Ram v. New Mexico Department of Environment, the OPM and SSA determinations were, so far as the Court is aware, "not the product of hearings or of formal procedures aimed at developing a factual record and giving the parties the opportunity to respond to argument and to cross-examine witnesses."  Id.  Rather, as the Court understands the process, the SSA and OPM both conduct investigations into DeSantis' evidence of disability without allowing the Agency respond or contest that evidence.  Moreover, the letters themselves give no indication of the evidence considered, or whether that evidence is the same as that now before the Court.  The Court thus finds that, like the HRD, EEOC, and DOJ letters, determinations, and decisions addressed

-44-

in Ram v. New Mexico Department of Environment, the OPM and SSA letters informing DeSantis that he has qualified for disability benefits lack -- without more of a record -- the necessary indicia of trustworthiness, and would thus be inadmissible at trial.  The Court therefore will not consider them in this summary-judgment proceeding.

Moreover, the Court also finds the evidence inadmissible under rule 403 of the Federal Rules of Evidence.  Rule 403 provides that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative."  Fed. R. Evid. 403.[32]  Unfair prejudice in the rule 403 context "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  Fed. R. Evid. 403 advisory committee's note.  A district court has "broad discretion to examine whether the probative value of evidence substantially outweighs the danger of unfair prejudice."  United States v. Reddeck, 22 F.3d 1504, 1508 (10th Cir.1994); United States v. Poole, 929 F.2d 1476, 1482 (10th Cir. 1991).  The Court would be concerned, as it was in Ram v. New Mexico Department of Environment, that the jury would decide that DeSantis' is disabled not upon its own judgment and understanding of the evidence, but on the fact that an ostensibly smart person looked at some evidence -- quite possibly evidence that is not presented to the jury -- and came to that conclusion.  See Beachy v. Boise Cascade Corp., 191 F.3d 1010, 1015 (9th Cir. 1999) (distinguishing agency determinations finding probable cause, which are admissible, from final agency determinations, which are inadmissible under rule 403, because final determinations make it "difficult [for a jury] to evaluate independently evidence of discrimination after being informed

---

[32] In this case, DeSantis has demanded a jury trial.  See Complaint ¶ 18, at 4.

of the investigating agency's final results."). Because the Court does not find these letters particularly probative, as discussed above, and because there is a risk that they would cause the jury to decide on an improper basis one of the most hotly contested issues in this case, the Court would exclude the evidence because its risk of prejudice substantially outweighs its probative value.

That DeSantis was able to convince the OPM and the SSA that he is, under the standards of those agencies, disabled indicates that he may have some evidence that he is disabled, as that term is defined for the purposes of the Rehabilitation Act. If he does have such evidence, however, it was his responsibility to present that evidence at the summary judgment stage of this lawsuit, or else risk having his suit dismissed. The Court on the motion and the jury at trial needs to review the evidence upon which the OPM and the SSA relied and not just accept the conclusions as evidence. DeSantis has failed to make the proper evidentiary showing to the Court regarding his impairment and how it substantially limits his ability to sleep or work. The Court will therefore grant the Defendant's motion for summary judgment and dismiss DeSantis' remaining claims.

## II. DESANTIS FAILED TO NOTIFY THE DEFENDANT THAT HE SOUGHT AN ACCOMMODATION FOR THE DISABILITY OF WHICH HE ALLEGES THE DEFENDANT WAS AWARE.

DeSantis' second theory of disability discrimination is failure to accommodate. For substantially the reasons that the Defendant asserts, the Court finds that this claim fails. For a plaintiff to succeed on a failure-to-accommodate theory of a disability-discrimination claim, the plaintiff must show: (i) he is disabled within the meaning of the Act; (ii) he is a "qualified" individual; (iii) the defendant was aware of the plaintiff's disability; (iv) the plaintiff requested an accommodation for the disability; and (v) the defendant failed to provide the necessary accommodation. See Whitney v. Bd. of Educ. of Grand County, 292 F.3d 1280, 1285 (10th Cir. 2002)("If a mental limitation is not 'known' to the employer, then any failure to accommodate that

limitation is not discrimination within the meaning of the ADA."); Taylor v. Pepsi-Cola Co., 196
F.3d 1106, 1109-11 (10th Cir. 1999); Massari v. Potter, No. 04-CV-02306-EWN-MJW, 2006 WL
318658, at *14.  The employee must initially inform the employer not only that he or she is disabled,
but that he or she desires an accommodation for that disability.  See EEOC v. Convergys Customer
Mgmt. Group, Inc., 491 F.3d at 795 ("[T]he employee must provide relevant details of his disability
and, if not obvious, the reason that his disability requires an accommodation."); Bartee v. Michelin
N. Am., Inc., 374 F.3d 906 (10th Cir. 2004)("[T]he interactive process must ordinarily begin with
the employee providing notice to the employer of the employee's disability and any resulting
limitations, and expressing a desire for reassignment if no reasonable accommodation is possible
in the employee's existing job."); Conneen v. MBNA Am. Bank, N.A., 334 F.3d at 332 ("[E]ither
by direct communication or other appropriate means, the employee 'must make clear that the
[he/she] wants assistance for his or her disability.'")(quoting Jones v. United Parcel Serv., 214 F.3d
at 408); Hall v. Claussen, 6 Fed. Appx. 655, 666 (10th Cir. 2001)("[A]n employee must ordinarily
initiate an interactive process with the employer by providing notice of his disability and any
resulting limitations and expressing a desire for reassignment."); Ballard v. Rubin, 284 F.3d at 962
(holding that the employee must provide "the employer with enough information that, under the
circumstances, the employer can fairly know of both the disability and the desire for an
accommodation.")(quoting Taylor v. Phoenixville Sch. Dist., 174 F.3d at 158-59); Davoll v. Webb,
194 F.3d 1116, 1132 n.8 (10th Cir. 1999)("[A]n employee requiring a reasonable accommodation
will need to initiate the interactive process by notifying the employer of his disability and resulting
limitations, and requesting reassignment if no reasonable accommodation is possible in the
employee's existing job."); Gantt v. Wilson Sporting Goods Co., 143 F.3d at 1046 & n.4 ("The
Commission's interpretive guidelines indicate that generally 'it is the responsibility of the individual

with a disability to inform the employer that an accommodation is needed.'"); Beck v. Univ. of Wis. Bd. of Regents, 75 F.3d at 1134; Paris v. Dep't of Treasury, 104 M.S.P.R. at 339 ("[A]n employee . . . has a general responsibility to inform his employer that he needs accommodation for a medical condition.").

DeSantis made numerous requests for a transfer to be closer to his wife in Salt Lake City. None of the transfer requests, however, cite any reason other than his desire to be near his wife. See Motion Exhibits C-Q. In none of DeSantis' requests for transfer did he submit any medical documentation or cite any medical condition in regards to the transfer request. See AR 2820:21-2821:1 (DeSantis); DeSantis Depo. at 152:3-12; id. at 197:2-22; id. at 209:17-210:2; id. at 221:1-6; id. at 246:19-249:2. DeSantis never submitted any request for a reasonable accommodation to Wilson or Skelton, nor did he mention any medical condition when requesting his transfer to Utah. See AR 259-269; id. at 2368:10-23 (Wilson); id. at 2370:9-18 (Wilson); id. at 2396:10-2397:4 (Skelton). Without providing the Defendant any notice that what is being requested is a reasonable accommodation for the disability of PTSD, the Court cannot properly find that the Defendant is liable for discrimination based on the failure to provide such accommodation.[33]

## III.   THE COURT REJECTS DESANTIS' CREDIBILITY ARGUMENT.

In closing, DeSantis argues that there is an issue of credibility that demands that the Court reject some of the prior testimony in the record and hold a trial. See Response at 22-23. He argues

---

[33] DeSantis argues in his brief that he filed a document on April 12, 2007, which uses the language "accommodation for his disability." See Response at 21-22. The document to which he cites, however, is unsigned and was made after DeSantis had been dismissed. See Response Exhibit 8. On page 2 of the document, DeSantis lists August 15, 2007 as the date his pay stopped and on the attached paragraph -- on page 6 of the document -- DeSantis states that his "separation from federal employment was involuntary and is being contested before the Merit System Protection Board (MSPB)." Response Exhibit 8, at 2-6. The Defendant therefore did not have access to this document on April 12, 2007, contrary to DeSantis' statement in his brief.

that Medina said that he removed DeSantis based on a written, national policy, yet there was no written, national policy provided in response to discovery requests.  <u>See</u> Response at 22-23. DeSantis insists that this inconsistency proves that either: (i) Medina blatantly lied on the stand during the initial hearing; or (ii) the Defendant withheld documents requested during discovery.  <u>See</u> <u>id.</u>  The Court discussed this issue at length in its prior Memorandum Opinion and Order, and need not reiterate its entire rationale in this opinion.  <u>See</u> Memorandum Opinion and Order at 11-16 (Doc. 57).  The Court incorporates its decision in the May 20, 2010 Memorandum Opinion and Order, at pages 11-16, here.  It is sufficient to say that the Court does not believe this apparent inconsistency warrants a trial when DeSantis cannot muster enough testimony and other evidence to create a genuine issue of fact.  The Court rejects DeSantis' credibility argument.

   **IT IS ORDERED** that the Defendant's Motion for Summary Judgment and Memorandum in Support is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

David Mark Conrad
Spring, Texas

-- and --

Ronald Tonkin
Houston, Texas

-- and --

-49-

Cori A. Harbour
Harbour Law Firm, P.C.
El Paso, Texas

    *Attorneys for the Plaintiff*

Gregory J. Fouratt
  United States Attorney
Phyllis A. Dow
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

    *Attorneys for the Defendant*